NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

IMPARATO STEVEDORING CORPORA-
TION, Respondent.

No. 12193.

United States Court of Appeals
Third Circuit.

Argued Oct. 10, 1957.

Decided Dec. 3, 1957.

298

Stephen Leonard, Washington, D. C. (Jerome D. Fenton, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Frederick U. Reel, Louis Schwartz, Attorneys, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Nicholas LaCarrubba, Brooklyn, N. Y., for respondent.

Before BIGGS, Chief Judge, and MARIS and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The National Labor Relations Board having found Imparato Stevedoring Corporation, the respondent-employer, guilty of unfair labor practices in violation of Section 8(a) (3) and (1) of the National Labor Relations Act, 49 Stat. 452 (1935), as amended, 29 U.S.C.A. § 158(a) (1952), petitions us for a decree enforcing its order against that concern.

Respondent handled stevedore operations under contract with the United States Government at the Bayonne, New Jersey, Naval Base from July, 1952 until July, 1955 and has been working the Leonardo, New Jersey, naval ammunition depot from August, 1953. Its employees at those places worked in gangs of 21 men including a person in charge, called the hatch boss. Respondent-employer obtained its Leonardo gangs from four locals of the International Longshoremen's Association, the representative union. Local 1588 supplied the first three gangs, Local 1247, the next two and two other locals one each. The Leonardo work when available was preferable as it consisted of handling ammunition and was paid for in double rates. Local 1588, the Bayonne local, supplied the gangs for the Bayonne operation. The ordinary procedure for obtaining men for a particular assignment would be for respondent to advise the union delegate of the number of gangs required. The delegate was supposed to select the gangs for the work by following a rotation system and notifying the selected gang. Each gang was known by the name of its hatch boss.

The controversy here has its source in the refusal of the Mazzucola (later the Wolkowski) gang to pay certain "assessments" or "kickbacks" to Local 1588. This practice, as far as the record reveals, started in 1950, prior to the time

respondent obtained the stevedoring contract at Leonardo but apparently during a period when Local 1588 was supplying the labor force to the concern which was doing the work. Each man in the Mazzucola gang was told by the hatch boss, Anthony Mazzucola, he would have to pay three dollars while working there. The money was to go to the union delegate Linquist "because Linquist wasn't making much of a [sic] money on salary." Cafasso, one of the gang, protested and Mazzucola told him he would have to "pay up" or "get out". The collections and payments to Linquist continued until December, 1952. At that time the New York Crime Commission was investigating the metropolitan waterfront and Linquist refused to take any payments because "things are getting too hot." At a meeting during this period the members of Local 1588 signed a paper reading:

"We the undersigned longshoremen members of I.L.A. Local No. 1588 of Bayonne, New Jersey have decided of our free will, to chip in a few dollars (When they clear—$150.00 salary only) per week of our pay for work at the Naval Ammunition Depot at Leonardo, N. J. to give to our Business Agent L. Leroy Linquist as a personal gift for his own use to use any way he sees fit, because we feel that he is unable to receive enough compensation for the services he is rendering us because of the fact that our local is a small one."

There had been no discussion of payments to Linquist at a meeting prior to this and the announced reason of the above quoted document was to make past collections "look legal". The paper itself, in line with that thought, was dated back to March, 1950. Sometime after the Crime Commission hearings had ended in March, 1953, at a meeting called by Linquist, one Wriole, respondent's hiring boss at Leonardo who was a member of 1588, proposed that each man working at Leonardo give Linquist two dollars a week and those at Bayonne, one dollar a week and those at Bayonne, one dollar. Members of the Mazzucola gang objected unless proper measures were taken to safeguard and account for the money. The suggestions were refused and the assessment voted. Thereafter the weekly payments were collected and turned over to one of a group selected by the membership to act as trustee of the fund. At a later 1953 union meeting when the fund had reached $3,200, a member proposed that the sum be turned over to Linquist and that course was approved by majority vote.

Thereafter, the Mazzucola gang refused to pay the assessment. Within two or three weeks of the meeting, Linquist said to Charles Mazzucola, "it looks like the Mazzucola [sic] doesn't want to pay no more" and that "I am going to get out to starve the Mazzucolas." Around December 2nd, 1953, the Mazzucola gang had orders to report for work at Leonardo. Respondent's hiring boss Wriole called out the gang under the name of a new hatch boss, Lou Miele. The gang would not answer the call. Wriole told them Anthony Mazzucola had beeen replaced because he "was too easy with the men". There was a conference subsequently with the I.L.A. international president, arranged by certain of the members of the Mazzucola gang and attended by them and Linquist. No one represented the respondent at this conference though the dispute was settled by a decree that Anthony Mazzucola should continue as hatch boss and the assessments should cease. In April, 1954, there was a new election of officers for 1588. The Mazzucolas lost and a new delegate, Delap, was named, instead of Linquist who did not run.

In May, 1954, Delap told Anthony Mazzucola he had decided, with the other hatch bosses agreeing, "to charge" the men the old two dollar rate for Leonardo work and one dollar for Bayonne. Anthony replied such action should be passed upon at a meeting of the local. Shortly afterwards he advised Delap that 90% of the gang would not pay. The delegate indicated his dissatisfaction with the gang. Later he

told a prominent Mazzucola member, Thomas Cafasso, "we will have to start assessing the fellows again" to purchase union quarters. Cafasso answered that for him to pay, Delap would have to show he needed the money for the benefit of the local and its members. Delap said "who doesn't pay will be left out * * * of work". About the same time Cafasso protested to Delap and the local president about discrimination against some hatch bosses on work assignments. Delap told Cafasso he should "get out of the local". Both Delap and the president mentioned that Cafasso did not want "to pay $2." The payments were resumed by all the gangs except Mazzucola. There was never an authorization of the payments by a meeting of the local.

In June, 1954, following Anthony Mazzucola's notification to Delap that his people would not pay the assessment, a notice was posted on the local's board assigning the Mazzucola gang to work in Bayonne that Monday and replacing Anthony with Pete Suprinski as hatch boss. Respondent's Superintendent Mattera testified that he believed John Imparato, respondent's secretary and treasurer, had discussed this with the union delegate and "surmised" that Suprinski "must have been agreeable" to the delegate, otherwise Suprinski would not have been made hatch boss. The Mazzucola gang refused to go to the Bayonne work because they considered Suprinski incompetent. Cafasso on the stand said: "We know Pete Suprinski was in with the delegate [Delap] that had collected and wanted to collect the $2. And we would be forced to pay or they would leave us out one at a time and we couldn't do nothing about it. As a body we could fight together * * * for our rights. As an individual we could not do it, which we found along the waterfront."

Because of this trouble Charles and Anthony Mazzucola had a talk with respondent's John Imparato. The Trial Examiner believed the Mazzucolas' report of the conversation. Charles testified that when he asked Imparato what he had against Anthony, the former said:

" 'I don't have nothing against him.' He says, he has no choice, his back is against the wall. And I don't know what he meant by that. I said, 'You don't want my brother? How about me, I am capable of taking the gang. As a rule the gangway man takes over.' He said, 'No, your name is Mazzucola, I can't take you either.'

"Q. Did he say why? A. No, he didn't tell me why.

"Q. What else did he say? A. He said if he had ten men working on his best gang and they didn't pay he'd get rid of them, and that is just what happened to us.

\* \* \* \* \* \*

"Q. Did he say anything about the Mazzucola's starving, or anything like that? A. He said yes, they were out to starve the Mazzucolas. He wouldn't tell us who. I have heard that before from Mr. Linquist."

Following that, Charles informed the Executive Officer of the Base that the gang was going to strike for its rights. The gang did picket the Base and a work shut-down resulted. On June 16, 1954, Charles filed an unfair labor practice charge against the respondent, alleging discrimination as to the Mazzucola gang. There was a conference attended by Board agents, John Imparato, Charles, and Cafasso. Frank Wolkowski was agreed upon as the new hatch boss. Respondent's hiring bosses were to notify the gang direct of work because of the Mazzucolas' claim that the delegate would have nothing to do with their gang since they were A.F.L. and were opposing him. Because of this settlement Charles withdrew his charges.

After Wolkowski had taken over, he protested that his gang was not receiving its fair share of the Leonardo work. The Board's Regional Office arranged another conference. There Wriole, respondent's hiring boss, said that he had not been assigning the gang to Leonardo because Suprinski had not been accepted. Respondent's attorney instructed Wriole

to give the gang enough of the work to even things up. An order approving the withdrawal of Charles' charges on that basis was entered October 29, 1954. The agreed work, however, was not assigned. Respondent conceded that the failure to do so was because of internal union affairs which prompted the delegate to handle the gang rotations to the detriment of the Wolkowski group.

The Trial Examiner found on substantial evidence that during this period as a result of union pressure the other gangs were slowing down the Bayonne work in consequence of the refusal of the Mazzucola gang to agree to Miele or Suprinski and the fact that respondent was hiring the gang outside of I.L.A. channels.

In December, 1954, a gang which had been working at Leonardo a few days before and the Wolkowski gang were given a ship unloading at Bayonne. At noon that day respondent's superintendent, according to him, received orders to stop one of the two gangs for the day. Either he or one of the other Imparatos directed the Wolkowskis to leave. The superintendent testified that Anthony Mazzucola cursed the particular Imparato, called "Poor John", saying "he needs straightening up with a two by four". Anthony, later called before respondent's secretary-treasurer, John Imparato, denied he had so spoken. He frankly admitted that as he was coming down the gang plank, forced to leave the work, he was bitterly complaining of the treatment accorded the gang. The Trial Examiner credited his version of the episode and there is ample justification for this in the record. However, Imparato suspended Anthony for two weeks with the time not beginning to run until his gang returned to work without him. This the gang refused to do and the gang

as a unit has not since worked for respondent.

The Trial Examiner found that Mazzucola's suspension was: " * * * entirely a direct result of, and Respondent would not have suspended Anthony except for, Local 1588's continuing and contemporaneous actions and other pressures upon Respondent to get rid of the Mazzucolas or otherwise subjugate them and the gang to Local 1588 control. Such conduct as to Anthony violated Section 8(a) (1) and (3) of the Act."

The Board held that respondent had discriminatorily denied employment to the Wolkowski gang at the Leonardo Depot from the time Wolkowski became hatch boss in June or July, 1954, until December, 1954, when the gang stopped working. It rejected the defense that it was the local's responsibility rather than that of the respondent to determine who worked at Leonardo.[1]

The Board also concluded that the suspension of Anthony Mazzucola was caused by the continuing pressures of the union local against the Wolkowski gang.

 Aside from respondent's admissions, the record makes it very clear that the Wolkowski gang was treated unfairly in the Leonardo work distribution because of the pressure on respondent from Local 1588. That pressure beyond doubt originated in the refusal of the Mazzucola men to submit to the forced assessment for the delegate. It is to be borne in mind that the weekly contribution, so called, was not for union dues. Conceivably it might be argued that there was nothing wrong with a bona fide gift from the union to its delegate. It cannot, however, be reasonably suggested that the rejection of the demand was a legitimate excuse for the union's

---

1. The defense was not again raised by respondents before us. To support the rejection of it the Board cited the earlier Imparato case, 1955, 113 N.L.R.B. 883. Other decisions by the Board reaching similar results are Pacific Intermountain Express Co., 1954, 107 N.L.R.B. 837; Air Products, Inc., 1950, 91 N.L.R.B. 1381 and cases cited therein at footnote 3, at page 1383. The thought expressed by these opinions is that the delegation to the union of some function of the employer's had the effect of encouraging membership in the union in violation of § 8(a) (3).

tactics which eventually brought about the discrimination in the work assignments at Leonardo and the suspension of Anthony Mazzucola with the subsequent refusal of his men to work under an unsatisfactory substitute. In yielding to this arrogant compulsion, respondent became a part of the union's vicious discrimination and fell into violation of Section 8(a) (1) of the National Labor Relations Act by reason of the resulting infringement of the rights of these employees under Section 7, 29 U.S.C.A. § 157 to refrain from payment of the assessment; also, by acting under the union's compulsion respondent violated Section 8(a) (3) since under the interpretation placed upon that section by Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455, an employer may not act so as to constrain participation or acquiescence by an employee in union activities or policies.[2] Respondent must bear its just responsibility for the results of the wrong. And that is true whether or not it knew the union's real motivation.

Respondent complains about the absence of witnesses from the union local and that two of its proposed witnesses were ill. Actually one of the latter attended the hearing and testified. No explanation of why the other's deposition was not taken appears. Nor is any answer attempted to the obvious question of why respondent did not subpoena union witnesses it may have desired to have present.

■ Respondent also argues at length against the informal nature of the hearing before the Trial Examiner, particularly because strict legal rules of evidence did not govern the treatment of hearsay evidence. The mere receipt of hearsay evidence even if it is immaterial and irrelevant is not enough to require reversal. Willapoint Oysters, Inc. v. Ewing, 9 Cir., 1949, 174 F.2d 676. Section 10(b) of the National Labor Relations Act, 49 Stat. 453 (1935), as amended 29 U.S.C.A. § 160(b) (1952), provides that any unfair labor practice proceeding "* * * shall, *so far as practicable,* be conducted in accordance with the rules of evidence applicable in the district courts of the United States * * *". (Emphasis supplied.)[3] Section 7(c) of the Administrative Procedure Act, 60 Stat. 241 (1946), 5 U.S.C.A. § 1006(c) (1952), is applicable to an unfair labor practice proceeding and provides: "Any oral or documentary evidence may be received, but every agency shall as a matter of policy provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence and no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence." The fundamental objection to the admission of hearsay evidence is not that it cannot be both material and relevant, but that it is not subject to the safeguards of cross examination. Wigmore on Evidence, 3d ed., Section 1362. Although hearsay evidence has been recognized as admissible in agency proceedings, reviewing courts have not lost sight of its shortcoming. Thus even under the more liberal original wording of Section 10(b) of the National Labor Relations Act[4] the Supreme Court stated that the "* * * assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncorrob-

2. This interpretation has been followed by the Board in Imparato Stevedoring Corp., 1955, 113 N.L.R.B. 883; Turner Construction Co., 1954, 110 N.L.R.B. 1860; Roadway Express, Inc., 1954, 108 N.L.R.B. 874.

3. The Board's regulations do no more than repeat the statutory language. 29 C.F.R. Section 101.10(a), 29 U.S.C.A.Appendix § 101.10(a).

4. "In any such [unfair labor practice] proceeding the rules of evidence prevailing in courts of law or equity shall not be controlling." 49 Stat. 454.

orated hearsay or rumor does not constitute substantial evidence." Consolidated Edison Co. of New York v. N.L.R.B., 1938, 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126. But hearsay having rational probative force and which is corroborated can constitute substantial evidence. "The requirement that the administrative findings accord with the substantial evidence does not forbid administrative utilization of probative hearsay in making such findings. Such construction would nullify the first portion of section 7(c), Administrative Procedure Act, providing for the receipt of such evidence. * * * [However] the findings, to be valid, cannot be based upon hearsay alone, nor upon hearsay corroborated by a mere scintilla." Willapoint Oysters, Inc. v. Ewing, 9 Cir., 174 F.2d 676, 690. We think that such evidence as there is in this record subject to criticism as hearsay is probative and amply corroborated by other evidence.

█ Respondent further complains that Local 1588 should have been brought in as a party respondent in order to have on hand witnesses who could have been cross-examined as to the veracity of the statements alleged to have been made by them. The witnesses were available to respondent by subpoena under Section 11(1) of the Act, 49 Stat. 455 (1935), as amended, 29 U.S.C.A. § 161(1) (1952) without the procedure suggested.

█ Finding as we do that the Board's conclusion is proper with respect to the unfair labor practice of respondent against the Mazzucola gang, it follows as the Board contends, that the discharge of Anthony Mazzucola was an important phase of the ouster of his gang. This leaves only the factual defense to Anthony's suspension, that his own actions caused it. As we have indicated, our own examination of the record satisfies us that on Anthony's testimony, especially when compared to that of the only other person who could have heard what he said, the Examiner was justified in concluding that Anthony did not threaten "Poor John" Imparato. Therefore the suspension was uncalled for and respond-

ent was in violation of Section 8(a) (3) and (1) by pursuing that course.

The Board's order as drawn is called for by the conclusions in this case. A decree to enforce it will be allowed, the Board to submit a form of decree.