Dr. Joseph GILBERT, Plaintiff,

v.

Donald JOHNSON and Dr. Marc J.
Musser, Defendants.

Civ. A. No. 16424.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 1, 1976.

Supplemental Opinion Sept. 20, 1976.

**863**

Sam F. Lowe, Jr., Mark Kadish, Atlanta, Ga., for plaintiff.

William Mallard, Asst. U. S. Atty., N. D. Ga., Atlanta, Ga., for defendants.

### ORDER

MOYE, District Judge.

This case presents a challenge by Dr. Joseph W. Gilbert, Jr., a physician formerly employed at the Veterans Administration Hospital [V.A.H.] in Atlanta, Georgia, until September 1, 1971, to his subsequent removal from the position of Associate Chief of Staff [ACOS] and transfer from the V.A.H., Atlanta, Georgia.

At the pretrial conference held in chambers on November 13, 1975, this Court indicated that the Court would review the administrative record of the 38 U.S.C. § 4110 Disciplinary Board hearing held October–December 1973 in connection with Doctor Gilbert's removal and transfer [i. e., item # 4 (page 12) of defendants' response filed July 3, 1975, to plaintiff's May 16, 1975, pretrial order]. This Order constitutes the Court's review of the administrative record.

The facts of this protracted litigation are as follows:

### Facts

The plaintiff, Dr. Joseph W. Gilbert, a trained cardio-thoracic surgeon with 17 years experience in his specialty, was recruited by the Veterans Administration to be Associate Chief of Staff for Education and Research [ACOS] at the Atlanta Hospital in late 1965. He joined the V.A. in that capacity in 1966 allegedly with the understanding that he would have patient care duties in his highly specialized field, cardio-thoracic surgery, besides administering the research program at the Atlanta V.A. Hospital.

The position of Associate Chief of Staff for Research and Education did not necessarily require a cardio-thoracic surgeon since the duties of the job were the conducting of research and administering the research program of the hospital.

Doctor Gilbert was excluded from patient care responsibilities during his tenure at the Atlanta V.A. Hospital, 1966–1970, despite the fact that thoracic surgeons were needed by the hospital and Doctor Gilbert was receiving additional compensation from the V.A. due to his Board certification and classification as a thoracic surgeon. Doctor Gilbert apparently experienced disappointment and frustration with his lack of patient care responsibility and ascribed this state of affairs to "institutional jealousy" by Drs. Julian A. Jarman, Hospital Director, and J. D. Martin, Chief of Surgery at Emory.

Doctor Gilbert requested Doctor Jarman to convene the Dean's Committee to review the controversy surrounding Doctor Gilbert's desire to have patient care duties during this period, but this was not done. Some friction, ill feeling and lack of cordiality arose between Doctor Gilbert and other V. A. staff members.

By March 1970, it became apparent to Dr. Lewis Jones, Chief of Staff at that time, that Doctor Gilbert's alleged "poor interpersonal relationships" with the V. A. staff had interfered with his administration of the Research Program at the hospital. In the narrative portion of his annual proficiency report on Doctor Gilbert for 1970, Doctor Jones wrote:

"The Research Program at this hospital does not approach the quality that is possible. It is my impression that there are few persons, if any, who would disagree with this estimate, including Dr. Gilbert himself. In my opinion, by far the most important reason for this failure has been Dr. Gilbert's inability to instill enthusiasm and his failure to encourage participation in research on the part of our staff. In fact, because of very poor inter-

personal relationships, Dr. Gilbert has discouraged persons from even visiting the research areas of this hospital. Dr. Gilbert's unsatisfactory relations extend outside this hospital to involve persons in the Medical School including the Chairman of Departments."

Doctor Jones's proficiency report continued:

"For the most part, information about research activities has been limited to the research areas because Dr. Gilbert has secluded himself within his office and laboratory. Everyone agrees that Dr. Gilbert has a brilliant mind and an extraordinary ability to express his thoughts both verbally and in writing; however, his extreme egocentricity makes it almost impossible for him to sensibly perceive and interpret what others are thinking or saying. It seems to me that this is the real basis for his extremely poor administrative ability. He would probably function better as an independent investigator, relieved of administrative responsibilities. In my opinion, it is not possible at this point for Dr. Gilbert to reconstitute any worthwhile relationships at this station which he may have had in the past or to generate new ones. I see no way that the research program at this hospital can profit from his continued presence.
. . ."

Doctor Gilbert rebutted vigorously these allegations at his subsequent hearing, and attributed these bad reports to jealousy and petty motives on the part of his superiors.

The Court notes that the Disciplinary Board found in its "Report of Findings" that the breakdown in communications with the staff might not have been caused entirely by Doctor Gilbert:

" . . . Dr. Smith in testifying on Specification # X111, brought out Dr. Gilbert's disappointment and frustration over his failure to gain a significant appointment at the V. A. Hospital, due in major part to resistance from chairman and members of the EUSM Department of Surgery. The Board was never able to determine the basis for this attitude, which became a source of increasing frustration for Dr. Gilbert and no doubt contributed to many of the interpersonal difficulties he experienced."

In contrast to Doctor Jones's view of Doctor Gilbert, a "site visit report" or "peer review" report on May 15, 1969, concerning Doctor Gilbert's management of the research program at the V. A. H. described Doctor Gilbert as

"a very creative, dynamic and aggressive individual, but, functioning alone, he has brought about piecemeal and slow progress . . . Dr. Gilbert, apparently almost single-handedly, has performed the real selection of programs, enticement of investigators (which have been few) to the program, and monitoring of the varied projects. His efforts have seemingly provided the communications between investigators after the initial approach of cross-fertilization of ideas failed because of lack of attendance at research conferences."

The site visit report appeared to lift some of the onus for the sluggishness of the V. A. Hospital's Research Program from Doctor Gilbert's shoulders when it noted:

"Institutional scientific direction [for the Research Program] is lacking. Local facilities in Atlanta . . . have been virtually neglected as possible sources of research collaboration or advice. A negative attitude toward research, prevailing in the past at the VAH and to some degree within some Emory clinical departments, has contributed to the small interest in research in the past of the faculty, staff or house staff of the VAH . . ."

Nevertheless, the remarks of Dr. Lewis Jones represented the hospital management's view of Doctor Gilbert's problems at that time and thereafter. This viewpoint, that Doctor Gilbert's "personality problems" were the major cause for the Research Program's failure to get off the ground, became the basis for Doctor Jarman's decision in April 1970 to relieve Doctor Gilbert of his duties as Associate Chief of Staff, although retaining Doctor Gilbert

on the Veterans Administration payroll for the purpose of continuing his own research. This action was followed up by a May 6, 1970 letter by Doctor Jarman to the Veterans Administration wherein he requested Doctor Gilbert's reassignment to another station due to the progressive breakdown of Doctor Gilbert's relationships with "almost everyone in this hospital and Emory."

On September 22, 1970, Doctor Jarman assigned Doctor Gilbert to the examination of veterans in connection with pension and compensation claims, an inferior position which allegedly was within the capability of a senior medical school student or intern, and which has been characterized by Doctor Gilbert and the Fifth Circuit Court of Appeals as "menial" and "totally unrelated to his highly-specialized field of cardio-thoracic surgery." *Gilbert v. Johnson,* 490 F.2d 827, 829–30 (5 Cir. 1974).

Although Doctor Gilbert was willing to do pension and compensation examinations as a part-time activity, his belief that accepting the job as a full-time position, when he was a skilled cardio-thoracic surgeon with 17 years' experience in that specialty, would have been extremely damaging to his career, led him to refuse the position and take a leave of absence without pay commencing November 30, 1970, in order to protect his reputation from the injury that he alleges it would receive from accepting the assignment. Moreover, at this time he was attempting to get a review of his situation and a hearing that he felt was required by the tenure rules of Emory University.

Doctor Gilbert spent his four-month leave of absence without pay—November 1970 to March 1971—in Leeds, England, where he took refresher training in cardio-vascular surgery.

Upon his return from Leeds in March 1971, Doctor Gilbert was ordered transferred to the Des Moines, Iowa, V. A. Hospital for training in general surgery. Doctor Gilbert regarded this as a further attempt to strip him of his cardio-thoracic surgery specialty. [It was undisputed on the record that cardio-thoracic surgery is a separate and distinct specialty from general sur-

gery.] Doctor Gilbert protested this transfer by letters dated June, July, and August 1971. He claimed that he was entitled to a hearing under the Veterans Administration statutes and regulations. See 38 U.S.C. § 4108(c), providing for a hearing before a "Board of Specialists." The V. A. Central Office replied that if Doctor Gilbert did not accept the reassignment he would be discharged. Doctor Gilbert was discharged on July 30, 1971, without a hearing.

This lawsuit was filed April 4, 1972. On June 16, 1972, this Court held that Doctor Gilbert was entitled to a hearing pursuant to 38 U.S.C. § 4110 prior to discharge and ordered that Doctor Gilbert receive back pay and compensation from the V. A. until the effective date of the decision of the § 4110 Disciplinary Board.

The Court, however, did not order Doctor Gilbert reinstated as Associate Chief of Staff.

The Court found that Doctor Gilbert's suspension as Associate Chief of Staff in April 1970, his detail to examination of compensation and pension patients in September 1970, and his transfer to Des Moines in March 1971 and subsequent termination on July 30, 1971

"originated in personality problems or personality misunderstandings between the plaintiff and others of the Veterans Administration set-up. Apparently, it became apparent to all concerned that Dr. Gilbert would best serve the Veterans Administration somewhere other than at the Atlanta Veterans Administration Hospital."

The Court further found:

"A major part of the job of Associate Chief of Staff of the Veterans Administration Hospital in Atlanta involved coordination of the research program including the recruitment and stimulation of other investigators who would work with or under the Associate Chief of Staff."

Title 38 U.S.C. § 4110(a) provides that a career Veterans Administration Department of Medicine & Surgery [DM&S] employee may be removed on three grounds:

"inaptitude, inefficiency or misconduct." This Court ruled on June 16, 1972, that

"A personality deficiency or personality defect that would interfere with the effective performance of that job [ACOS] is, in effect, a species of inaptitude or inefficiency with respect to the job in question. . . ."

The Court continued:

"Therefore, the removal from the job of Associate Chief of Staff, the detail to compensation claims examinations, and the transfer were in effect actions based upon charges of inaptitude or inefficiency and a hearing was required to be held with respect thereto under Title 38 U.S.C. § 4110."

On August 28, 1972, following this Court's Order, the V.A. advised Doctor Gilbert that he had been assigned once again to conduct pension and compensation examinations at the Atlanta V.A. Hospital. Doctor Gilbert refused this assignment, arguing that it was contemptuous of the Court's Order, a damaging and punitive disciplinary action taken without a hearing, and a continued attempt by the V.A. arbitrarily to destroy his reputation by undercutting his specialized surgical qualifications by placing him in a demeaning position.

In September 1972 Doctor Lewis Jones, Chief of Staff of the Atlanta V.A.H., began a preliminary investigation of Doctor Gilbert before the Disciplinary Board hearing was to be held, as is required by V.A. Regulations. V.A. Manual, MP–5, Part II, Chapter 8, Section A, 5(c)(1).

In December 1972, in an effort to reach a negotiated settlement of this litigation, the V.A. offered Doctor Gilbert an assignment in his specialty, thoracic surgery, at the Little Rock, Arkansas, V.A. Hospital. Although this proposed assignment was within his specialty, Doctor Gilbert rejected it because the V.A. still had not complied with the Court's June 16, 1972 order and because, in the words of Doctor Gilbert's counsel,

"In the posture in which he found himself, the acceptance of this type of negotiated settlement would be tantamount to an admission on his part that his removal

as Associate Chief of Staff, and his ultimate discharge were justified. The refusal to accept the Little Rock negotiated settlement was not unreasonable in light of Dr. Gilbert's knowledge that Drs. Jones and Jarman had endeavored to smear his professional reputation with negative references, including the allegation that he was 'mentally ill' and 'homicidal.' Dr. Gilbert believed, and would so testify, that the only way to repair his reputation and reclaim his professional prestige was by . . . reinstatement . . . ." Letter Brief filed February 9, 1976, p. 16.

In February 1973, the V.A. assigned Doctor Gilbert to the out-patient surgical clinic of the Atlanta V.A. Hospital. Doctor Gilbert rejected this assignment for the same reasons he had turned down the pension and compensation examination position.

After Doctor Gilbert rejected this last offer, a second preliminary investigation of Doctor Gilbert was started by Mr. John R. Pollard of the V.A.'s Central Office in Washington.

By April 1973, the V.A. had neither sent a letter of charges to Doctor Gilbert nor held the statutory hearing ordered by the Court on June 16, 1972, nor paid the money judgment to Doctor Gilbert ordered by the Court. The plaintiff filed a motion to enforce judgment which this Court denied, May 10, 1973. The Fifth Circuit Court of Appeals reversed this Court on March 6, 1974, and ordered enforcement of the June 16, 1972 judgment.

In the meantime, on July 25, 1973, thirteen months after this Court ordered a hearing, Doctor Gilbert was served with a letter of charges accusing him of failure "to effectively conduct and administer the research program of Veterans Administration Hospital, because of personality problems and personality misunderstandings . ." Twenty-two specific charges followed, purporting to support the main charge and evidencing Doctor Gilbert's "frequently unsuitable [conduct] for a Veterans Administration employee." These charges primari-

ly consisted of incidents in which Doctor Gilbert was accused of *inter alia* : "angrily yelling" (XVII); making "derogatory comments" (XVIII); assuming "a superior air" (XIX); starting to scream, shout and furiously wave [his] arms (XI); being "rude, discourteous and unprofessional" (IV); exhibiting "anger and hostile behavior"; launching "into a long tirade" (XXII) and (VI) or launching a "diatribe" (XXI).

On October 15, 1973, sixteen months after being so ordered, the V.A. commenced Doctor Gilbert's Disciplinary Board hearing. The hearing extended through December 12, 1973, and produced a transcript record of 4,021 pages plus exhibits and other documents.

On July 17, 1974, the Disciplinary Board issued its findings. The Board sustained the main charge that Doctor Gilbert's failure "to effectively conduct and administer the research program . . . because of personality problems . . ." was a species of "inaptitude" under 38 U.S.C. 4110(a). With reference to the other two grounds for removal under Section 4110(a), the Board stated, "We do not find specific evidence of inefficiency or of misconduct." However, the Board failed to find for or against Doctor Gilbert on any of the 22 specific charges. While noting that during the hearing "Doctor Gilbert effectively rebutted the specifications of the charge[s] involving these witnesses," the Board found that

"the impression remains that his manner and attitude evoked negative responses in these witnesses which appeared to hamper his interpersonal relationships and effectiveness in the organization."

The Board's findings continue:

"The Board notes that in the four years of Doctor Gilbert's active tenure as Associate Chief of Staff, he developed many protocols, proposals and reports. However, there was no evidence presented of the initiation of any research career development program, of any traineeship application actually funded, or of foreign research fellowships developed and funded. There was not a single instance in which outside research collaboration involving program development, i. e., with the Center for Disease Control, NASA or Georgia Tech, was finalized, approved and funded. This lack of accomplishment could in no way be attributed to Doctor Gilbert's lack of ability, diligence or energy. These frustrations we believe can be attributed in great part to the formidable opposition to him within the VAH and EUMS. He must, we believe, bear some responsibility for the apparent antagonism evoked by his personality.

"The Board recognizes that Doctor Gilbert did accomplish some things and proposed many more admirable programs in the face of obstruction. It is also quite apparent to the Board through testimony and direct observation that Dr. Gilbert is a man of high principle and laudable ambition. He will not accept second best and will fight vigorously for his beliefs. That he should return to his native state and his alma mater to meet such eventually overwhelming opposition is ironic. However, we must conclude that based on the opposition apparently evoked by Dr. Gilbert's personality, that his efforts to develop a significant research program at VAH, Atlanta, were eventually and significantly frustrated."

After sustaining the charge that Doctor Gilbert failed to administer the V.A.H. program effectively, the Board concluded with respect to disciplinary action:

"We find many extenuating and mitigating circumstances which move us to recommend only minimal disciplinary action which we believe will be in the best interests of Dr. Gilbert and the Veterans Administration."

On August 8, 1974, John D. Chase, M.D., Chief Medical Director of the Atlanta V.A. Hospital, informed Doctor Gilbert that he agreed with the findings and recommendations of the Disciplinary Board. Doctor Chase in that letter announced his decision to reassign and transfer Doctor Gilbert to another V.A. facility which would be disclosed later.

On October 30, 1974, Chief Medical Director Doctor Chase informed Doctor Gilbert that he would be transferred to the V.A. Hospital in Birmingham, Alabama. [The plaintiff claims to have inadvertently seen a teletype message between the Birmingham V.A.H. and the V.A. Central Office in Washington indicating that Doctor Gilbert would not be engaging in his speciality of cardio-thoracic surgery in Birmingham, but would be limited to conducting cardio-vascular research, and working as a staff physician in the out-patient clinic.]

On August 17, 1974, Doctor Gilbert appealed the decision of Chief Medical Director, Doctor Chase, to Richard L. Roudebush, the Administrator of the V.A.

On March 17, 1975, the administrator sustained Doctor Chase's decision and his order of transfer.

On March 26, 1975, Doctor Gilbert requested Administrator Roudebush to reconsider his decision. The Administrator reaffirmed his decision by letter of May 2, 1975.

*Jurisdiction of the Court and Scope of Review of the Administrative Record*

The Court's jurisdiction in reviewing the Disciplinary Board's decision and the other proceedings in the administrative record is delineated by the Administrative Procedure Act [APA]. The APA provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

However, this right to review does not apply to agency action "to the extent that . . . [the] action is committed to agency discretion by law." 5 U.S.C. § 701(a).

In the Fifth Circuit, judicial review of federal employee personnel decisions, as in the case *sub judice,* is limited to a determination of (1) whether the employee has been afforded administrative procedural due process as provided by statute, regulation and the United States Constitution; and (2) whether the decision was arbitrary or capricious, *Davis v. Vandiver,* 494 F.2d 830 (5 Cir. 1974); *Mann v. Klassen,* 480 F.2d 159, 161 (5 Cir. 1973); *Dozier v. United States,* 473 F.2d 866 (5 Cir. 1973); *Anonymous v. Macy,* 398 F.2d 317 (5 Cir. 1968); *Chiriaco v. United States,* 339 F.2d 588 (5 Cir. 1964). See also *Kletschka v. Driver,* 411 F.2d 436 (2 Cir. 1969); *Sexton v. Kennedy,* 523 F.2d 1311 (6 Cir. 1975); *McGhee v. Johnson,* 420 F.2d 445 (10 Cir. 1969); and *Pauley v. United States,* 419 F.2d 1061 (7 Cir. 1969).

The Ninth and Third Circuits have expanded the scope of judicial review of these adverse personnel decisions to encompass a determination of whether there is "substantial evidence" to support the decision below on the merits. *Toohey v. Nitze,* 429 F.2d 1332 (9 Cir. 1970), *Charlton v. United States,* 412 F.2d 390 (3 Cir. 1969). However, this is the minority view of the Circuit Courts of Appeal.

The rationale behind the majority view is that agency personnel decisions are relegated to the discretion of the agency, *Keim v. United States,* 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774 (1899); *Meehan v. Macy,* 129 U.S. App.D.C. 217, 392 F.2d 822, 830 (1968), and the district court has neither the power nor responsibility to act as a super Civil Service Commission in reviewing the propriety and wisdom of those decisions on their merits, *Sexton v. Kennedy, supra* at 1314. As the Court of Appeals stated in *Hargett v. Summerfield,* 100 U.S.App.D.C. 85, 243 F.2d 29, 32 (1957), *cert. den.,* 353 U.S. 970, 77 S.Ct. 1060, 1 L.Ed.2d 1137 (1957):

"The function of a reviewing court in cases involving the discharge of civil service employees is a limited one [citation omitted]. The judicial function is to determine whether there has been substantial compliance with applicable procedures and statutes, and not to review the administrative determination as to the wisdom or good judgment of the agency in exercising discretion."

The Fifth Circuit embraced the reasoning of *Hargett v. Summerfield* in *Chiriaco v. United States,* 339 F.2d 588 (5 Cir. 1964):

"No departure from the required standard of procedural due process appears, and the scope of judicial review in a matter of this kind is limited to the determination of that question." *Chiriaco v. United States,* 339 F.2d at 590.

Subsequent cases have limited this review to the issue of administrative due process only:

". . . Confining itself to consideration of the record made in the Civil Service hearing and proceedings, the Court properly limited its review of the Commission's decision to whether there had been a departure from the required standard of procedural due process. The merits of the determination by the Commission under the Veterans Preference Act, 5 U.S.C.A. § 7512, that the termination of Dozier's employment was for such good cause as will promote the efficiency of the Service was not subject to review." *Dozier v. United States,* 473 F.2d at 868 (5 Cir. 1973).

"It is clear that the district court does not have the authority to review the facts of the plaintiff's dismissal, except to inquire whether the administrative proceedings, which resulted in his discharge, conformed to the requirements of administrative due process. *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 [other citations omitted]." *Mann v. Klassen,* 480 F.2d at 161 (5 Cir. 1973).

Although the Second Circuit in *Kletschka v. Driver, supra,* and the Fifth Circuit in *Mann v. Klassen, supra,* and *Anonymous v. Macy, supra,* foreclosed completely a review of the underlying merits of the administrative proceeding, it is apparent from the Fifth Circuit opinions in *Chiriaco v. United States, supra; Dozier v. United States, supra; Davis v. Vandiver, supra,* and the opinions cited *supra* from the other circuits, that the Court should look to the underlying merits solely for the limited purpose of determining whether the agency action was arbitrary or capricious.

The Courts, however, define the term "arbitrary or capricious" very narrowly.

"*Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis.* '[S]omething more than error is necessary to spell out arbitrary or capricious action.' * * * The fact that on the same evidence a reviewing court could have reached a decision contrary to that reached by the agency will not support a determination that the administrative action was arbitrary and capricious." *N.L. R.B. v. Jas. H. Matthews & Co.,* 3 Cir., 342 F.2d 129, 131 (1965); *see also United States v. Carmack,* 329 U.S. 230, 243–244, 67 S.Ct. 252, 91 L.Ed. 209 (1946) and *United States ex rel. Rongetti v. Neelly,* 7 Cir., 207 F.2d 281, 284 (1953). (emphasis added).

This Court rejects the minority view expressed by the Ninth and Third Circuits and in reviewing Doctor Gilbert's administrative record limits the Court's inquiry to an analysis of the following two issues:

(I) Was Doctor Gilbert denied procedural due process as secured for him by statute, regulation or the United States Constitution? (II) Was the agency action on its merits arbitrary or capricious in that it was not supportable on any rational basis?

### I. Procedural Due Process

The plaintiff before, during, and after the Disciplinary Board hearing raised numerous issues concerning the V.A.'s alleged denial of his procedural due process rights. They are treated hereinafter:

(1) *The Letter of Charges alleges charges which are vague, general and unspecific and which fail to allege actions by Doctor Gilbert warranting a disciplinary proceeding.*

On July 25, 1973, the V.A. Regional Medical Director, Dr. R. M. Whittington, wrote Doctor Gilbert a "Letter of Charges" which apprised him of the charge of failing to effectively conduct and administer the V.A.'s research program because of personality problems, and which supported that charge with the particulars of 22 incidents.

A typical charge from the letter reads as follows:

"XV. In or about February, 1970, Dr. William C. Butz, Assistant Chief, Laboratory Service, Veterans Administration, came to you seeking assistance with respect to a research project he had in mind. As soon as Dr. Butz informed you of the reason for the visit, you went into a long diatribe about management and research at the Veterans Administration Hospital. You talked to Dr. Butz in this vein for approximately 45 minutes without permitting Dr. Butz to get any more comments in about his research project. Your comments were highly unfavorable to Hospital management, the Dean's Committee and Dean Richardson."

Doctor Gilbert's position is that none of the 22 charges, like the above, constitutes the basis for a disciplinary proceeding and that by failing to designate a specific time, date, place, person involved, detail, and other reasons, each charge fails to comport with the Fifth Amendment's due process clause and the applicable V.A. Regulations. See V.A. Manual MP–5, Part I, Chapter 12, Section A, and G–1; and DM&S Supplement, MP–5, Part I, 7.02, p. 10.

■ The Court overrules plaintiff's contention that the incidents portrayed in these charges fail to constitute a proper basis for a 38 U.S.C. § 4110 disciplinary proceeding. The Court ruled in its June 16, 1972 Order that a personality defect could be a species of "inaptitude" under § 4110. Clearly, the V.A. cannot be foreclosed from proving those incidents whereby Doctor Gilbert's "personality problems" manifested themselves in his relationships with his colleagues at the Veterans Administration Hospital. The Court therefore believes the V.A. was acting within the scope of its authority to inquire into these incidents in connection with a disciplinary proceeding under 38 U.S.C. § 4110. Moreover, disciplinary action is authorized in a situation such as this by V.A. Regulation, DM&S Supplement, Part II, Chapter 8, Section A(3) which provides:

"Whenever an employee's performance of duty or his *personal conduct* is unsatisfactory because of inaptitude, inefficiency, neglect, or unwillingness to comply with instructions, established policies, procedures, rules and regulations, and with *commonly accepted standards of personal conduct,* appropriate disciplinary action will be taken in accordance with the provisions of this section." (emphasis added)

■ Plaintiff's second contention concerning the Letter of Charges is that the charges are vague, general and unspecific and failed to adequately apprise Doctor Gilbert of the charges against him. The Court has examined the Letter of Charges and found the charges to be stated in a sufficiently clear way as to enable Doctor Gilbert to defend himself. The motion of Doctor Gilbert at the hearing to quash the letter for these reasons was unfounded in law and if granted would have exacted of the Disciplinary Board a higher degree of specificity in drafting the Letter than would be required in a Grand Jury's bill of indictment in a criminal matter.

The Fifth Circuit addressed itself to this type of claim in *Davis v. Vandiver,* 494 F.2d 830–31 (1974), wherein the Court stated:

"Davis [the discharged employee] impliedly demands a highly detailed catalog of offenses clearly setting forth each imaginable species of malfeasance which could result in substantial discipline. The short answer to this contention was well expressed by the District of Columbia Circuit: '[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes "catchall" clauses . . .' *Meehan v. Macy,* 1968, 129 U.S.App.D.C. 217, 392 F.2d 822, 835 modified 138 U.S. App.D.C. 38, 425 F.2d 469, *quoted in Arnett v. Kennedy, supra* [416 U.S. 134, 94 S.Ct. 1633], at 1648, 40 L.Ed.2d 15."

Accordingly, the Letter of Charges comports with the specificity standard as set out by *Davis v. Vandiver, supra,* and plain-

tiff's objections in this regard are not well-taken.

(2) *The Disciplinary Board was improperly convened inasmuch as Doctor Gilbert's reassignment and separation on September 1, 1971, was an administrative and not a disciplinary decision.*

■ The Court ruled on this contention, raised by Doctor Gilbert at the Disciplinary Board Hearing, in the Court's June 16, 1972, Order wherein the Court ruled that Doctor Gilbert's removal and transfer was not purely administrative, but was a disciplinary action for which a § 4110 hearing was required. *See* similar ruling in *Kletschka v. Driver,* 411 F.2d 436, 444–45 (2 Cir. 1969). Plaintiff's objection in this regard is overruled.

(3) *The Disciplinary Board was not a neutral and detached tribunal.*

■ The Disciplinary Board which convened on October 16, 1973, consisted of three physicians, Doctors Christianson (Chairman), Fiege (Secretary), and Bell. They were selected by the Chief Medical Director, Doctor Musser, in accordance with 38 U.S.C. § 4110(a) and V.A. Regulation MP–5, Part II, Chapter 8, Section C, Paragraph 3(a).

Doctor Gilbert argues that Chief Medical Director Musser should have been precluded from appointing the Disciplinary Board members because Doctor Musser himself approved the removal of Doctor Gilbert as Associate Chief of Staff and originally denied Doctor Gilbert's request for a hearing. In addition, Doctor Gilbert alleges that Doctor Musser solicited recommendations for Disciplinary Board members from V.A. personnel antagonistic to Doctor Gilbert. Moreover, he argues, the appointed Disciplinary Board members are all physicians, subject to the V.A.'s regulations, "under the lawful direction of the V.A.," dependent on their relationship with the Chief Medical Director. Thus, their positions at the V.A.H., Atlanta, preclude their being a "neutral and detached tribunal" as plaintiff alleges is required by *Morrissey v. Brewer,*

408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The defendant asserts that the composition of the board is set by V.A. regulations with a view to giving an accused physician a hearing by his peers who could be expected to be more sympathetic and understanding of his problems than a group of laymen would be. Plaintiff has not shown or even alleged exertion of pressure or influence on the board members.

The Court finds plaintiff's objections in this regard to be unpersuasive.

Absent any specific allegations of misconduct, bias or prejudice by the Board members in this case (there is none alleged), the Court rules that the appointment of these Board members by Chief Medical Director Musser complied with the V.A.'s regulations and statute and in no way contravened the United States Constitution.

Plaintiff's reliance on *Morrissey v. Brewer, supra,* and *Goldberg v. Kelly, supra,* is misplaced. These cases may be distinguished on their factual circumstances and are not the closest Supreme Court precedent on the question of the procedural due process rights of a government employee in challenging adverse action to him.

Rather, the parties' attention is directed to *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (plurality opinion), and *Bishop v. Wood,* —— U.S. ——, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). The *Arnett* case, *supra,* held that, in the context of the discharge of a non-probationary federal employee pursuant to the provisions of the Lloyd-LaFollette Act, 5 U.S.C. § 7501, the Fifth Amendment does not require that Congress, in granting by statute a federal employee a termination hearing, must bestow therewith "the full panoply of rights which attend a trial-type adversary hearing." In *Arnett, supra,* 416 U.S. at 151, 94 S.Ct. at 1643, the Court held that a *post*-termination hearing was sufficient to comply with the due process clause of the Fifth Amendment.

The recent case of *Bishop v. Wood, supra,* casts further doubt on the scope of procedural due process guarantees in the area of government employment. In *Bishop, supra,* the Supreme Court held that a city ordinance permitting the discharge of permanent city employees for cause as a matter of state law did not give a city policeman a "property" interest in his continued employment, which was protected by the due process clause of the Fourteenth Amendment of the Constitution because the position was held at the "pleasure and will" of the city. Accordingly, the Court found no constitutional right to a pretermination hearing, even if the charges brought against the employee were false.

■■■■ Taken in tandem with *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), these cases establish the proposition that in the absence of a "property right" in a government job, the employee may be removed from his position by the government without constitutionally required procedural due process protections. Where Congress has provided an employee with a right to administrative due process in the removal procedure, this provision does not engage the full panoply of rights that would adhere to "a trial-type adversary hearing." *Arnett, supra,* 416 U.S. at 151, 94 S.Ct. 1633.

In *Davis v. Vandiver, supra* at 833, citing *Arnett,* the Fifth Circuit rejected a claim like the instant one that the tribunal which recommended a government employee's discharge was not undetached and impartial:

"Davis's argument regarding biased decisionmakers is equally without force. Five Justices in *Arnett* perceived no constitutional infirmity in the employee's being dismissed by the very person who initially brought the charges of misconduct. In the case *sub judice,* Davis was dismissed not by the charging party, the detachment commander, but by the detachment personnel officer who acted with the approval of the State Adjutant General. We can only conclude that in this respect the Air National Guard provided more than the Constitution required."

Notwithstanding that Doctor Gilbert's Board was chosen by Doctor Musser, who, it is alleged, may have been eager to transfer Doctor Gilbert, and, despite the fact that the Board members were subject to Doctor Musser's authority, it is clear from *Arnett* and *Davis* that the Board's impartiality passes constitutional muster and was also in compliance with the provisions of § 4110(a).

(4) *The Veterans Administration failed to give Doctor Gilbert prior notice that the events for which he was charged had occurred and to counsel with him to give Doctor Gilbert an opportunity to know the charges and change his behavior.*

This contention by Doctor Gilbert appears to be predicated in large part on two V.A. Regulations which either provide for or imply that informal counseling or conciliation procedures should be employed before an employee is brought before a Proficiency Board or a Disciplinary Board. Doctor Gilbert argued at the Disciplinary Board hearing that he had a right to be made aware that charges against him were being brought to the attention of higher authority, *before* the Letter of Charges was issued, in order to give him a chance to conciliate the charges.

The defendants contend that, not only did plaintiff receive considerable counselling concerning his conduct and job performance and was well aware of what V.A. management considered his shortcomings prior to receipt of formal charges, but he had ample time after receiving the Letter of Charges to formulate a response thereto.

The V.A. Regulation concerning Disciplinary Action to which Doctor Gilbert refers is found in DM&S Supplement, MP–5, Part II, Chapter 8, Section A(5)(c)(1) and (2). It provides:

"c. *Initiation of Proposed Action*

(1) The Medical Officer, highest in authority at the station, will assure that a thorough preliminary inquiry is conducted to obtain all of the facts prior to the

official initiation of a request for proposed action, *including those facts relating to the employee's view in the matter.* When initiating proposed disciplinary action more severe than admonishment or reprimand, the station [head] will forward the preliminary inquiry and any pertinent comments of station officials to the Chief Medical Director for review. If the review shows that the appropriate disciplinary action should be reprimand or less, the Chief Medical Director may take the action or he may refer the matter, through the Area Medical Director, to the station [head] for action.

(2) When station heads request the removal, demotion, or suspension of an employee through preferment of charges, the request will be evaluated for the Chief Medical Director by a Central Office Screening Committee. The organizational structure of this committee will be similar in nature to that outlined for Disciplinary Boards in paragraph 3 of section C. The Chief Medical Director will appoint all members of the Screening Committee. No person may serve on both a Disciplinary Board and a Screening Committee in handling the same case." (emphasis supplied)

■ It is apparent to Doctor Gilbert that (c)(1), *supra,* implies that in conducting the "thorough preliminary inquiry" and in obtaining "those facts relating to the employee's view in the matter," the Medical Officer must consult and counsel with the subject of the inquiry in an effort to clear up a matter prior to initiating a request for proposed action. While such an effort would be laudable and possibly advantageous to both the employee and the agency, it is not apparent from the face of the regulation that the Medical Officer had a *duty* to counsel or conciliate with plaintiff. Certainly the Constitution does not mandate such a pre-preliminary investigation attempt at counseling or conciliation. *Arnett v. Kennedy, supra.* The Court does not believe such a duty must be read into the regulation. Therefore, plaintiff's objection in this regard is overruled.

■ The plaintiff alleges, however, that the applicable V.A. Regulations require that the rating officials counsel and advise their subordinates concerning the annual Proficiency Report made for each employee. See DM&S Supplement, MP–5, Part II, Chapter 6, Paragraph 6.11(c)(d). This regulation provides that a conference be held with the employee, whether his rating is satisfactory or unsatisfactory.

Doctor Gilbert alleges that these regulations were ignored by Doctors Jarman and Jones, who inserted unsatisfactory comments into Doctor Gilbert's personnel file without the counseling or notice required by the regulation, *supra.* These actions are offered by the plaintiff as evidence of the pattern of due process violations to which Doctor Gilbert has been subjected during these proceedings by the V.A. While the Court cannot condone any purported violations of Doctor Gilbert's right under the regulations to have been counseled in connection with his Proficiency Report, the Court fails to see how this purported violation is significantly related to the Disciplinary Board hearing and plaintiff's procedural due process rights therein and this Court's review of same. Accordingly, the objection is overruled as insubstantial.

(5) *The Veterans Administration failed to conduct a truly "thorough preliminary inquiry."*

In this contention, related to the previous one, Doctor Gilbert argues that the V.A. failed to conduct a truly "thorough preliminary investigation," under the regulation MP–5, Part II, Section A(5)(c)(1) cited *supra.* Alternatively, Doctor Gilbert appears to argue that the preliminary investigations were *too* thorough in that the investigators interviewed over 100 V.A. employees in a "witch hunt" to "get" Doctor Gilbert.

It is undisputed that the two "preliminary investigations" which took place [(1) September-October, 1972, by Doctor Lewis Jones; (2) February-April, 1973, by William Pollard] occurred *after* (not before) Doctor Gilbert was initially removed and transferred (September 30, 1971), because

the investigations were conducted pursuant to this Court's June 16, 1972 order which directed the V.A. to hold a § 4110 Disciplinary Board hearing.

Plaintiff claims that neither Doctor Jones's investigation nor Mr. Pollard's investigation was impartial because both were *ex post facto* attempts to conduct a "witch hunt" against Doctor Gilbert by exceeding the permissible basis for the Letter of Charges of July 25, 1973, which should have related back only to Doctor Gilbert's original separation and transfer. Doctor Gilbert alleges that Mr. Pollard's investigation sought to explore additional avenues to attack Doctor Gilbert and was not designed to elicit facts supportive of Doctor Gilbert's side of the story. This is allegedly shown by the fact that Mr. Pollard's examination of Doctor Gilbert by deposition on April 10, 1973, never gave Doctor Gilbert the opportunity to state his side of the story. Moreover, Doctor Gilbert was physically absent from the hospital for a period of three years prior to receipt of the July 25, 1973, Letter of Charges, and had neither the access to the records and documents, associates and staff, nor the advantage of the incumbency of his position, as did the V.A. investigators. Consequently, it is alleged that the more than 100 interviewed employees simply told their "bosses" what the "bosses" wanted to hear about an already-discharged employee.

In response, the V.A. states that the two investigations carried out by the V.A. were complete and thorough. The affidavit of Robert E. Coy, Veterans Administration Assistant General Counsel, filed May 14, 1973, shows that the "case" of Doctor Gilbert was active from the time the V.A. received this Court's June 16, 1972 order until the close of the Disciplinary Board hearing in December 1973. Plaintiff was interviewed by Mr. Pollard and was given the opportunity to present his views to the agency prior to the preparation of charges. ′Even if plaintiff's allegations are taken as true, the Court does not believe that his administrative due process rights were jeopardized thereby. Doctor Gilbert had the full opportunity at the Dis-

ciplinary Board hearing to tell his side of the story and to cross-examine the V.A.'s witnesses, besides presenting his own. Moreover, the Disciplinary Board never saw the reports of the preliminary investigation. Neither the regulations nor the Fifth Amendment's due process clause warrants that the preliminary investigation preceding the serving of the Letter of Charges be an "equal time" proposition guaranteeing to the subject of the inquiry and his witnesses the same investigative time and effort by the investigators as for the "prosecution-oriented" witnesses. See *Davis v. Vandiver, supra,* and *Arnett v. Kennedy, supra.* The scope of the preliminary investigation is vested in the sound discretion of the V.A. and this Court does not find that any due process right of the plaintiff was substantially prejudiced by that investigation.

(6) *The V.A. failed to disclose to Doctor Gilbert copies of all documents, transcripts, memoranda and tapes gathered by the two V.A. investigations, or alternatively evidence which the V.A. proposed to use against him.*

 At the Disciplinary Board hearing, counsel for Doctor Gilbert made a motion in the nature of a discovery motion for the V.A. to turn over to him copies of every document, transcript, memoranda and tape relating to the two V.A. investigations, including written statements of employees who were interviewed. Doctor Gilbert asserts that he was denied his right effectively to cross-examine and confront adverse witnesses by the failure of the V.A. to disclose to him its investigative file of him and the list of witnesses to be examined.

Alternatively, Doctor Gilbert claims that he was entitled to have disclosed to him before the hearing the oral and documentary evidence which the V.A. proposed to use against him. If not that, Doctor Gilbert claims that he had the right to examine a witness's statement following the witness's direct examination, but before cross-examination at the hearing. Lastly, Doctor Gilbert asserts that at least the exculpatory evidence in the possession of the V.A.

should have been disclosed to Doctor Gilbert before the trial, citing the criminal cases of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Ladd,* 48 F.R.D. 266 (D.Alaska, 1969), and *United States v. Graves,* 428 F.2d 196 (5 Cir. 1970).

On August 9, 1973, Doctor Gilbert requested by letter that the V.A. furnish him with copies of all documents, statements, transcripts and tapes obtained as a result of the two V.A. investigations of Doctor Gilbert. The V.A. responded by letter dated August 28, 1973, from Robert E. Coy, Assistant General Counsel, refusing Doctor Gilbert's request. The V.A. position was that no information or evidence would be considered by the Disciplinary Board except that which was presented at the hearing. Copies of any documentary evidence presented at the hearing would be made available to Doctor Gilbert at the hearing. The V.A., by letter of Mr. Coy (September 12, 1973), and Doctor Christianson (September 11, 1973) informed the plaintiff that it was the position of the V.A. that the rules of evidence, discovery and subpoena power, which were available to a litigant in a federal civil trial, were inapplicable to a § 4110 Disciplinary Board Hearing.

Doctor Gilbert claims that by failing to allow him pre-hearing discovery and disclosure of the evidence and witnesses to be used against him, he was denied his due process rights of confrontation and cross-examination under *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Doctor Gilbert also cites this Court's decision in *Parker v. Letson,* 380 F.Supp. 280 (N.D.Ga. 1974), which relied on *Ferguson v. Thomas,* 430 F.2d 852 (5 Cir. 1970), for the proposition that minimum due process requires that the subject of a discharge hearing ". . . be advised of the names and the nature of the testimony of witnesses against him."

Moreover, Doctor Gilbert argues that it was the V.A.'s position at the hearing that the Disciplinary Board proceeding was ad-

ministrative and not adversarial in nature. In light of this, Doctor Gilbert's counsel argues:

"If the 'non-adversary' remarks had been made in good faith, it should have been incumbent upon V.A. legal counsel to make available to Doctor Gilbert the full reports of investigation, and, at the very minimum, any exculpatory statements or documentation contained therein. How the agency could be prejudiced by rendering such exculpatory materials in a non-adversary administrative hearing defies the imagination."

Doctor Gilbert argues that it was error for the Board to refuse to review the two investigative reports at least for material exculpatory to Doctor Gilbert. As evidence for his position that exculpatory material and witness statements exist in the file, Doctor Gilbert cites the instances of two witnesses, Dr. Shirley Rivers and Mrs. Virginia Watkins. Both these witnesses were interviewed by the V.A.'s investigators and gave statements favorable to Doctor Gilbert. The V.A. called neither at the Disciplinary Board hearing. Doctor Gilbert called both as witnesses on his behalf. However, it was only because Doctor Rivers and Mrs. Watkins individually and independently contacted Doctor Gilbert and offered to testify in his behalf, that Doctor Gilbert became aware of their proffered exculpatory testimony.

The defendants' response to these allegations is threefold.

The defendants contend that Doctor Gilbert had ample opportunity at the hearing to cross-examine all witnesses produced by the V.A. Given the extensive length of the hearing and the fact that it recessed for an extended period and then resumed, the defendants argue that no prejudice can be shown since the plaintiff had ample time and opportunity to obtain witnesses to refute anything said by a government witness.

The defendants state that Doctor Gilbert had no legal right to see the contents of the material in the investigative files, or the pre-hearing statements of witnesses who

testified. *Heffron v. United States*, 405 F.2d 1307, 186 Ct.Cl. 474 (Court of Claims, 1969). The defendants argue that in *Heffron, supra,* the court held that the fact that plaintiff was shown only part of an investigation report on him was not prejudicial since the Hearing Officer and the Civil Service Commission in *Heffron* had access to only the same parts as the employee. The defendants show that in Doctor Gilbert's case,

"... the board did not see any of the investigative reports. The board heard and considered only what plaintiff heard and saw at the hearing; there is no injury to plaintiff when he did not see something which the disciplinary board also also did not see."

Concerning plaintiff's claim that he was denied an opportunity to depose and interview witnesses and otherwise gather information for use in the disciplinary board hearing, the defendants argue that no one prevented Doctor Gilbert or his counsel from talking to any employee of the V.A. and obtaining any statement they desired. A review of the hearing transcript shows that the plaintiff and his counsel spoke with "a number of people, in and out of the Veterans Administration, concerning this matter."

The Court does not find that any procedural due process right of plaintiff was violated by the V.A.'s failure to provide plaintiff with a list of witnesses, statements, memoranda, transcripts, tapes or exculpatory evidence prior to the hearing.

The Veterans Administration Regulations provide for the following principal due process procedures before a V.A. disciplinary board:

a. Letter of charges

b. The right of the employee to request a hearing

c. The right to respond to a Letter of Charges

d. Notice of the hearing

e. The right of the employee to appear personally and to be represented by legal counsel or V.A. counsel at the hearing

f. The Chairman to rule on all questions arising during the proceedings such as admissibility of evidence, calling of witnesses, order of their introduction, etc.

g. V.A. attorneys may serve as advisors to the board.

h. The employee will have the right to call upon witnesses, who, if willing to testify, will be heard. The Chairman, Disciplinary Board, will, on his own initiative or at the request of the employee, call such witnesses as may be necessary to develop the evidence. It will be considered the duty of all VA employees who appear as witnesses to furnish information fully and honestly whether it be favorable or derogatory to the employee charged . . . . . .

i. The Chairman, Disciplinary Board, will permit the parties to the case to ask questions of witnesses and will use reasonable discretion to exclude irrelevant testimony in order to uncover, develop and consider all pertinent facts. Both sides will have opportunity to properly present and support their respective positions upon any question or matter presented to the board for decision.

j. A stenographic or mechanical verbatim is to be made of the board's proceedings.

k. Witnesses will be sworn under oath.

l. The Secretary of the board will read the charges and specifications contained in the Letter of Charges to the employee. Additional charges, which the accused employee has had no notice to defend, may not be introduced.

m. In the opening statement, the Chairman will give a brief summary of the charges set forth in the Letter of Charges. He will introduce evidence and call witnesses to testify in such order as he sees fit. The Chairman will direct the questioning of the accused employee and witnesses.

n. The board is not obliged to content itself with the evidence presented for

consideration. Where such evidence appears to be insufficient for a proper determination of any issue or matter, the board will take appropriate action to obtain such additional evidence as is necessary or advisable. The board may recall a witness, summon new witnesses, request that an inquiry along certain lines be made with a view to discovering and producing additional evidence, etc. The request, suggestion or motion that additional evidence be called for may be made by any of the members of the board.

o. The board may refer the accused employee to an appropriate "reviewing authority" where the employee's mental condition is in issue.

p. The findings and recommendations of a Disciplinary Board will be based solely on the evidence presented and will not be influenced by any knowledge of other factors in the case. To sustain a charge, the board must find on all the evidence that the employee has committed the offense(s) with which he is charged.

[All the above is set out in DM&S Supplement, MP–5, Part II, Chapter 8, Section A.]

▇▇▇▇▇ The Court rules that the V.A. procedures listed above, though failing to provide for the pre-hearing discovery and disclosure requested by the plaintiff, comply easily with the minima of due process procedures set out by the Supreme Court in *Arnett v. Kennedy, supra.* The V.A. need *not* afford the plaintiff the full panoply of rights that he would have in a trial-type adversary hearing. *Arnett, supra.* As the Fifth Circuit stated in *Davis v. Vandiver,* 494 F.2d at 832–33 (1974), in ruling that Mr. Davis's termination hearing was valid under *Arnett*:

"Davis was provided with notice of the charge and granted a reasonable opportunity to respond prior to his discharge. Subsequent to his dismissal he was afforded a full-scale evidentiary hearing presided over by a hearing examiner. *Arnett* demands no more."

See also *Charles v. Blount,* 430 F.2d 665, 666 (7 Cir. 1970), where the Court, in reviewing the employee's discharge for its conformance with the requirements of administrative due process, defined the minimal requisites of due process as:

". . . *i. e.,* whether the employee was accorded a fair and open hearing on articulated charges with the right of confrontation and cross-examination. *Morgan v. United States,* 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 . . .; *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 . . .; *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 . . ."

Nowhere is there stated a constitutional requirement, which the plaintiff urges, that the pre-hearing discovery and disclosure procedures be available to a government employee challenging an adverse personnel decision in an administrative hearing.

The cases cited by plaintiff are not persuasive. *Brady v. Maryland, supra; United States v. Ladd, supra,* and *United States v. Graves, supra,* are all criminal cases wherein the full panoply of due process rights has long been assured and guarded by the Fifth Amendment and the courts. It is axiomatic that the procedural due process perquisites in a criminal trial are not applicable in full to an administrative hearing. *Arnett, supra.* The plaintiff misreads *Morrissey v. Brewer, supra,* a case involving due process guarantees for parolees facing revocation of parole, for the proposition that proposed evidence, and the contents of statements, transcripts and tapes and witness lists must be turned over to the accused *before* the hearing. *Morrissey* simply requires that the accused parole violator, after fair notice of the charges, be confronted with the evidence, statements and witnesses against him *at the hearing.*

Similarly, plaintiff's reliance on *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), is misplaced. *Greene* held that a government employee, in challenging the revocation of his security clearance on grounds of communistic associations, could not be questioned by the Board

from secret reports and confidential statements which the Board refused to show the employee for security reasons. The Supreme Court held that this type of proceeding (absent any executive authorization therefor) denied the employee his right effectively to cross-examine and confront the evidence and witnesses against him.

The instant factual situation is readily distinguishable from that in *Greene v. McElroy*. Neither the Board nor Doctor Gilbert had access to the preliminary investigation reports. All the evidence, documents and witness statements presented against Doctor Gilbert were available to him and his counsel to inspect, confront and cross-examine. The *Greene* case is inapposite to the case *sub judice*.

· Lastly, Doctor Gilbert relies on *Parker v. Letson, supra,* a decision of this Court based on *Ferguson v. Thomas, supra.* Both cases involved discharged school faculty members suing to enforce their rights to procedural due process. In *Ferguson,* the Fifth Circuit set out four due process requirements that should be adhered to "within the matrix of the particular circumstances present when a teacher who is to be terminated for cause opposes his termination . . .:

"(a) he be advised of the cause or causes for his termination in sufficient detail to fairly enable him to show any error that may exist,

"(b) he be advised of the names and the nature of the testimony of witnesses against him,

"(c) at a reasonable time after such advice he must be accorded a meaningful opportunity to be heard in his own defense,

"(d) that hearing should be before a tribunal that both possesses some academic expertise and has an apparent impartiality toward the charges . . ."

It is evident to the Court that despite *Ferguson's* provision for pre-hearing disclosure of witnesses and their testimony in a school teacher termination hearing, *see* (b), *supra,* the due process procedures provided for by the V.A. in DM&S Supplement, MP-5, Part II, Chapter 8, Section A, set out

*supra,* are more than adequate to comport with the Fifth Amendment's due process clause, under *Arnett v. Kennedy,* even though pre-hearing discovery and disclosure is not provided for. *Davis v. Vandiver, supra.* The Fifth Circuit recognized that due process procedures may vary according to varying circumstances when the Court stated in *Ferguson, supra* at 856:

". . . the standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved."

■ To this extent, *Arnett* must be construed as modificatory of *Ferguson, supra,* and *Parker v. Letson, supra,* in the context of a 38 U.S.C. § 4110 V.A. Disciplinary Board Hearing. The failure of the V.A. to afford plaintiff pre-hearing discovery and disclosure being not violative of the statute, the V.A. Regulations or the United States Constitution, plaintiff's objections in this regard must be overruled. The Court fails to see how plaintiff's other objections that exculpatory witnesses were not disclosed to him or that the Board's failure to review the preliminary investigation reports for exculpatory evidence raise cognizable due process violations, considering the foregoing discussion of the due process requirements of a § 4110 hearing. They are therefore overruled. The plaintiff had the opportunity to, and was in no way restricted from, interviewing any witnesses at the V.A., many of whom were clearly named for him in the Letter of Charges. All witnesses were subject to cross-examination at the hearing, and in fact were confronted and cross-examined by Doctor Gilbert's counsel. The Court finds no due process violation in this regard.

(7) *The Disciplinary Board failed and refused to limit the evidence offered by the V.A. to the charges set out in the July 25, 1973 Letter of Charges.*

■ The plaintiff argues that the Disciplinary Board heard evidence on matters

previously unknown to Doctor Gilbert and of which Doctor Gilbert had no notice in the Letter of Charges, making it impossible for Doctor Gilbert to defend himself. The plaintiff shows that Doctors Ralph Vogel, Julian A. Jarman, James Coberly and Mr. Thomas Scott brought new allegations concerning Doctor Gilbert's statements and actions during their testimony concerning the 22 original specifications in the Letter of Charges. The plaintiff's counsel contends that

"The new charges may well have been pivotal in the Board's finding that although none of these specifications set forth in the letter of charges had been sustained [sic], the general charge was sustained."

Counsel argues that lack of notice as to these "new" allegations precluded an effective rebuttal by Doctor Gilbert.

The defendants' position is that:

"Plaintiff continues to ignore the existence of the general charge of failure to 'effectively conduct and administer the research program . . . because of personality problems and personality misunderstandings' as set out in the Letter of Charges to Dr. Gilbert. Certainly there were 22 specifications in the Letter of Charges, but all related to one primary charge of inaptitude. Even a cursory reading of the hearing transcript shows the great bulk of the testimony related to the general charge."

The Court notes that the V.A. regulations referred to above (DM&S Supplement, MP–5, Part II, Chapter 8, Section A) provide that the Chairman is to rule on all evidentiary matters, that all witnesses are to furnish information fully and honestly whether it be favorable or derogatory to the accused employee, and that the Chairman "will use reasonable discretion to exclude irrelevant testimony in order to uncover, develop and consider all pertinent facts."

More importantly in considering plaintiff's objection *instanter* are the provisions that "Additional charges, which the accused employee has had no notice to defend, may not be introduced;" and the provision that the board may "request that an inquiry along certain lines be made with a view to discovering and producing additional evidence . . . ."

Lastly, the regulations provided that "the findings and recommendations of a Disciplinary Board will be based solely on the evidence presented . . . ."

It is apparent from the "Findings" of the Board that the Board relied upon the 22 original incidents or specifications to support the Board's finding sustaining the general charge of inaptitude due to personality problems. Moreover, it appears to the Court that the additional comments of the witnesses concerning Doctor Gilbert's demeanor were relevant to the general charge and a legitimate area for inquiry by the Board under the scope of the regulations quoted *supra.*

Under these regulations, the witnesses were under a duty to testify fully and honestly and the Board was under a duty to find facts only on the basis of the evidence presented during the hearing and not introduce new charges at the proceeding. The Court finds that the Board adhered to the mandates of these regulations. There is no evidence to support plaintiff's claim that wholesale due process violations occurred because the Board, by "failing" to sustain the 22 specific charges, must have relied on the new allegations brought out during the hearing to support the general charge. The plaintiff argues that this deprived Doctor Gilbert of notice and a chance to defend himself and tainted the Board's decision which was founded upon evidence which should have been properly excluded from the record. The Court rejects this theory. *See* the Fifth Circuit's decision in *Mann v. Klassen,* 480 F.2d 159 (1973), rejecting a claim that the Board, in reviewing the record, considered information outside the record. Accordingly, plaintiff's objections in this regard are overruled.

(8) *The Disciplinary Board relied on inadmissible hearsay, and hearsay-upon-hearsay.*

This oft-repeated objection was raised by Doctor Gilbert's counsel through every stage of the administrative hearing and against every witness. It is undisputed that much hearsay testimony was admitted by Chairman Doctor Christianson. What is at issue is the extent to which hearsay is admissible in an administrative hearing and whether plaintiff was substantially prejudiced thereby such that the admission of this hearsay deprived him of due process.

It has been held that administrative agencies are not restricted to rigid rules of evidence. *Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *Prater v. United States,* 172 Court of Claims 608 (1965); *Chun Kock Quon v. Proctor,* 92 F.2d 326 (9 Cir. 1937). Hearsay testimony is admissible in cases like the instant one, *Reil v. United States,* 456 F.2d 777, 197 Ct.Cl. 542 (1972). It has been held that hearsay evidence is admissible in administrative hearings as long as the evidence upon which a decision is based is both substantial and has probative value, *Jacobowitz v. United States,* 424 F.2d 555, 191 Ct.Cl. 444 (1970). Whether the hearsay constitutes substantial evidence must be weighed in light of the whole record. *Reil v. United States, supra.*

"Although hearsay evidence has been recognized as admissible in agency proceedings, reviewing courts have not lost sight of its shortcoming." *National Labor Rel. Bd. v. Imparato Stevedoring Corp.,* 250 F.2d 297, 302 (3 Cir. 1957). Thus the Supreme Court has stated that the

". . . assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having national probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence." *Consolidated Edison Co. of New York v. N.L.R.B.,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

Hearsay evidence which has rational probative force and which is corroborated may constitute substantial evidence:

"The requirement that the administrative findings accord with the substantial evidence does not forbid administrative utilization of probative hearsay in making such findings . . . [However] the findings, to be valid, cannot be based upon hearsay alone, nor upon hearsay corroborated by a mere scintilla." *Willapoint Oysters, Inc. v. Ewing,* 174 F.2d 676, 690 (9 Cir. 1949).

■ The Court therefore employs a standard which will sustain hearsay evidence if the hearsay has rational probative force and is corroborated by more than a mere scintilla. The Court's determination will be based on an examination of the whole record.

■ The plaintiff claims that the record of the Board's proceedings is "replete with uncorroborated hearsay." "No two witnesses," claims plaintiff's counsel, "testified to the same specification." Doctor Gilbert points to testimony by Doctor Jarman concerning the statements of Doctor Smith (not called to testify) and Doctor Thoroughman (deceased), and Doctor Crutcher's second-hand opinions from unnamed residents at the hospital as two examples of the hearsay and hearsay-upon-hearsay contained in the record.

The Disciplinary Board, however, made its findings of fact based on the first-hand testimony of those principals involved in the 22 specifications. For example, Doctor Jones testified about Specification II, in which he was named; Doctor Jarman testified about Specification I, which named him; Dean Richardson testified from first-hand knowledge about Specification IX; Doctor Coberly testified from first-hand knowledge about Specification VII; Doctor Butz testified first hand about Specification XV, which named him; Mr. Howard Stone testified from first-hand knowledge about Specification XXII and Mr. Stanley Buffa testified from first-hand knowledge about Specification XX.

The Court finds upon examining the record as a whole that the Disciplinary Board gave the most probative value to the non-hearsay evidence in the record and that the hearsay evidence itself in the record is in large part probative and amply corroborated by other evidence.

Accordingly, plaintiff's objections concerning hearsay testimony are hereby overruled.

(9) *The Disciplinary Board erred as a matter of law in its July 17, 1974 Findings and in the disciplinary action it recommended.*

Doctor Gilbert raises a number of objections in connection with the Board's finding, issued July 17, 1974.

First, the plaintiff contends that since the Board did not find *against* Doctor Gilbert with respect to any of the 22 specifications, the general charge of (inaptitude in) failing to effectively administer the V.A.'s research program cannot be sustained. The plaintiff apparently misreads the Board's statement, "We do not find specific evidence of inefficiency or of misconduct" to mean that the Board found no specific evidence to support the 22 charges. The Court disagrees with the plaintiff's construction of this sentence. As already discussed *infra,* it appears to the Court that the Board, in making the above statement, was limiting its findings to those involving "inaptitude" and was eliminating the other two grounds for disciplinary action under 38 U.S.C. § 4110, namely "inefficiency" and "misconduct." The Board expressly stated that

"To this extent the Board must therefore sustain the charge alleging Dr. Gilbert's failure to effectively conduct and administer the research program . . . because of personality problems . . ."

Moreover, the report of the Board's findings refers specifically to number specifications and the Board's discussion of them shows that these specifications were proven to the Board's satisfaction.

While it is regrettable that the Board did not find specifically for or against Doctor Gilbert on each of the 22 charges, it is clear to the Court from the Board's findings that the Board sustained in large part these specifications. Therefore, the Court rejects completely plaintiff's oft-urged argument that "the Disciplinary Board . . . announced that not one of the 22 specifications contained in the Letter of Charges was borne out by the evidence presented."

Plaintiff argues next that the Board erred in not taking additional evidence before issuing its findings. Specifically, the plaintiff urges the Board to look at the reports of the preliminary investigations (discussed *infra* ) and to take the testimony of V.A. witnesses other than the 17 called by the V.A. (out of 100 interviewed). Plaintiff claims that the V.A.'s witnesses were a

"carefully selected cross-section of witnesses who had been uncovered by the canvass done by Doctor Jones, Mr. Carson and Mr. Pollard, not one of whom was favorable to Doctor Gilbert."

While the Disciplinary Board could, if necessary, take additional evidence [see DM&S Supplement, MP–5, Part II, Section A], the Court finds this objection by Doctor Gilbert to be without merit inasmuch as the record discloses, and the Court holds, as a matter of law, that the Board had more than enough evidence with which to reach a decision. The hearing was an extended one. The Board heard much evidence. No error was committed by the Board's decision not to take more testimony.

The plaintiff charges that the Board erred in failing to make findings on the subject of whether Doctor Gilbert was "mentally ill" as was alleged by Doctor Jarman. This was the subject of two days of testimony at the hearing. Although the Board has a duty under the regulations, *supra,* to refer the employee to "an appropriate reviewing authority" when the employee's mental health is in issue, the Court finds no error in the failure to the Board to do so. It appears that the Board did not accept this charge and the Board would

have *erred* had it made findings on this allegation because Doctor Gilbert's mental condition was not raised in the Letter of Charges and the Board was precluded thereby from finding on that issue. See regulations, *supra.*

The plaintiff's next claim is two-fold: (1) That plaintiff's subsequent transfer order to Birmingham was not a "minimal disciplinary action" as recommended by the Board, but was a severe sanction; (2) That the V.A. regulation provides for only five sanctions: admonishment, reprimand, suspension, demotion, discharge, and transfer is not one of them. Therefore, plaintiff's transfer order contravenes the mandate of the Disciplinary Board and the V.A.'s own regulations.

■ This contention was squarely addressed by the Second Circuit Court of Appeals in *Kletschka v. Driver, supra,* at 444–45, and ruled on, in part, adversely to plaintiff. After finding that Doctor Kletschka's "transfer" was really a disciplinary action warranting a hearing under 38 U.S.C. § 4110, the Court *in dicta* discussed the sanctions which the V.A. might impose, if the Disciplinary Board sustained the charges:

> "After the hearing the board may recommend to the Administrator 'suitable disciplinary action, which shall include reprimand, suspension without pay, reduction in grade, and discharge * * *.' These four possible steps do not seem to exhaust the content of 'suitable disciplinary action,' and we assume that the board could recommend a transfer as well. While under § 4110(d) the Administrator is free to reject a recommendation for disciplinary action, he is not, as we read the statute, free to impose disciplinary action which the board has not recommended. Indeed V.A. regulations specifically prohibit the use of 'staff adjustments,' including transfers, 'as a device to effect separation of employees when their separation for disciplinary reasons would be proper.' V.A. Dept. of Medicine & Surgery, Supplement, MP–5 Pt. 2, ¶ 8(c), June 1, 1964."

The *Kletschka* Court seems to hold that the Board has discretion to recommend a transfer as a "suitable disciplinary action," but that the Administrator is not free to impose a transfer if the Board has not recommended it. The instant case presents a situation wherein the Board has not recommended a specific sanction, but has called for "minimal disciplinary action" (which it has the power to do under *Kletschka, supra* ). The issue here is whether the Administrator can impose a "transfer" as a "minimal disciplinary action" without running afoul of *Kletschka.* Doctor Gilbert argues that "minimal disciplinary action" ought to reflect a sanction at the lower end of the V.A.'s punishment scale—*i. e.,* "admonishment," "reprimand" or "suspension." "Transfer" is a somewhat drastic sanction which, the plaintiff argues, is more consonant with the "maximum" disciplinary actions provided by the regulations, *i. e.,* "discharge" or "demotion."

The Court rules that the *dicta* in *Kletschka, supra,* under the circumstances of this case, does not bar the Administrator from imposing the sanction of "transfer" where the Disciplinary Board has recommended "minimal disciplinary action."

Title 38 U.S.C. § 4110(d) provides as follows:

> "(d) A disciplinary board, when in its judgment charges are sustained, shall recommend to the Administrator suitable disciplinary action, within limitations prescribed by the Administrator, which shall include reprimand, suspension without pay, reduction in grade, and discharge from the Department of Medicine and Surgery of such person. *The Administrator shall either approve the recommendation of the board, approve such recommendation with modification or exception, approve such recommendation and suspend further action at the time, or disapprove such recommendation . ."* (emphasis supplied)

It is clear from *Kletschka* that "transfer" by itself is not an unwarranted sanction in an appropriate case. *Kletschka's* objection was that the Administrator could not order

a transfer in the absence of a Disciplinary Board recommendation of "transfer." The Court rules that *Kletschka's* rather narrow reading of the powers of the Board and the Administrator under § 4110(d) is not directly applicable here.

Inasmuch as the statute permits the Administrator to "approve [the Disciplinary Board's] recommendation with modification or exception," the Court construes the statute to grant the Administrator sufficient flexibility and discretion under the instant circumstances to order a "transfer" where the Board has recommended "minimal disciplinary action." The limitations on the Disciplinary Board's power to impose sanctions are prescribed by the Administrator, under the statute, § 4110(d). *Kletschka* cannot be read to give the Disciplinary Board power to impose a different sanction than the Administrator. Under the circumstances of this case, despite the contentions of plaintiff, the Court believes that "transfer" is a "minimal disciplinary action" within the scope of the Board's recommendation, and that the Board recommended "minimal disciplinary action" to afford the Administrator the range and flexibility to impose an appropriate sanction such as transfer. The Administrator's decision does not run afoul of the Board's recommendation. A transfer may be appropriate in a § 4110 disciplinary proceeding, *Kletschka, supra.* The facts of this case are such that a transfer may be the most appropriate disciplinary action here. Accordingly, plaintiff's objections in this regard are therefore overruled.

### (10) *Waiver*

█ The Court ordered a § 4110 Disciplinary Board hearing for Doctor Gilbert by Order entered June 16, 1972. The hearing was not held until 16 months later on October 16, 1973. The plaintiff urges this delay as evidence of the defendants' bad faith toward plaintiff and claims that by delaying, the V.A. waived its right to bring Doctor Gilbert before the Disciplinary Board. The plaintiff states:

> ". . . the plaintiff is unable to understand, and, it is submitted, the V.A.

has never adequately explained, why, immediately following this Court's June 16, 1972 decision, a Disciplinary Board was not convened to hear the specific charges against Dr. Gilbert."

Indeed, the Court of Appeals remarked on March 6, 1974:

> "The stated position of the Veterans Administration is unsatisfactory as to why it has . . . failed to immediately hold a hearing." *Gilbert v. Johnson,* 490 F.2d 827 (5 Cir. 1974)

Nevertheless, while the delay in holding Doctor Gilbert's hearing was regrettable, the Court is not inclined to rule on these facts that this delay constituted a waiver by the V.A. of the bringing of disciplinary charges against Doctor Gilbert at a Disciplinary Board hearing for the reasons set forth below.

The administrative record in this case and the affidavit of V.A. Assistant General Counsel, Robert E. Coy, in particular, amply demonstrate that Doctor Gilbert and the V.A. discussed settlement negotiations during this time, nearly reaching agreement, and that the two preliminary investigations carried out by the V.A. were extensive and time-consuming, adding to the delay. Mr. Coy's affidavit shows continual V.A. activity in the Gilbert matter during 1972–1973. Accordingly, plaintiff's argument that the V.A. waived its right to bring Doctor Gilbert before a disciplinary proceeding is overruled.

### (11) *Other Objections*

The Court deems the numerous other objections advanced by plaintiff to be overly technical, insubstantial or non-prejudicial. They warrant no further consideration at this time. As the Fifth Circuit Court of Appeals stated in *Dozier v. United States, supra* at 868:

> "Dozier showed no prejudice by not having a copy of the case record. We are unwilling to say that every deviation from specified procedure, no matter how technical, automatically invalidates a discharge, especially in the absence of any showing of prejudice. See *McCallin v.*

*United States,* 1967, 180 Ct.Cl. 220; *Brown Telecaster, Inc. v. Federal Communications Commission,* 1961, 110 U.S. App.D.C. 127, 289 F.2d 868, *cert. denied,* 368 U.S. 916, 82 S.Ct. 196, 7 L.Ed.2d 131; 5 U.S.C.A. § 706."

See also *Mann v. Klassen,* 480 F.2d 159, 161 (5 Cir. 1973), rejecting insubstantial claims.

II. *Was the Action of the Veterans Administration Arbitrary and Capricious?*

▮▮ The Court decided *infra* that the standard to be employed in determining whether Doctor Gilbert's removal and transfer was arbitrary and capricious was whether the V.A.'s action was "not supportable on any rational basis." *NLRB v. Jas. H. Matthews & Co.,* 342 F.2d 129, 131 (3 Cir. 1965).

In reviewing the complete administrative record, the transcript of the Disciplinary Board hearing, and the pleadings, briefs and other documents in the file, the Court is satisfied that there is overwhelming evidence to support a rational basis for the Board's finding that Doctor Gilbert failed to effectively administer the V.A.'s research program due to personality problems. The Disciplinary Board found that

"What emerges from a review of the evidence submitted on the charges is the conclusion of the Board that Dr. Gilbert progressively alienated many professional peers, most key administrators and some ancillary and administrative personnel with whom he had contact . . . Dr. Gilbert succeeded over a four year period in losing the confidence and support of the Hospital Director, Chief of Staff, Chiefs of several major clinical services, the Dean of the Affiliated Medical School and the leadership of the Department of Surgery. While many of these differences arose over matters of principle, there appeared to have been an inability on the part of Dr. Gilbert to accept the realities of the situation and to work patiently with the hospital and the school to build a successful research program."

That a Veterans Administration physician may be transferred due to his ineffec-

tive personal relationships with others at the V.A. Hospital, and that this alone does not constitute arbitrary and capricious action by the V.A. was the holding of *Kletschka v. Driver, supra,* at 443, a case decided on very similar facts to the case *sub judice,* wherein the Court stated:

"The decision to transfer the plaintiff, while it did not involve any considerations of scientific expertise beyond the competence of a court, did purportedly rest on a judgment that the strained personal relationships between plaintiff and members of the hospital staff were interfering with the work at the hospital. This would appear to provide a permissible basis for a transfer in the absence of any statutory or regulatory provisions prohibiting the consideration of such factors. Obviously we cannot review the wisdom or good faith of this transfer without subjecting all such personnel decisions to a similar review. Such a course would encourage a vast quantity of litigation and deprive the V.A. administrator of an element of flexibility which is necessary if he is to operate his department efficiently. Where the challenged personnel decision falls short of discharge we believe that, in general, the courts should seek to discourage arbitrary agency action by enforcing the various procedural rights of affected employees, and not by undertaking a full substantive review of the justification for the decision. See *McTiernan v. Gronouski,* 337 F.2d 31, 34 (2d Cir. 1964); *Baum v. Zuckert,* 342 F.2d 145, 147 (6th Cir. 1965); *McEachern v. United States,* 321 F.2d 31, 33 (4th Cir. 1953). The general refusal of the courts to review the merits of personnel decisions finds additional support in the difficulty of verifying or refuting the wisdom of judgments based on partly intuitive assessments of personal competence and the ability of one man to work in harmony with others. See *Saferstein, supra,* at 363; cf. *Capolino v. Kelly,* 236 F.Supp. 955, 956 (S.D.N.Y.1964), aff'd 339 F.2d 1023 (2d Cir.) (per curiam), cert. denied 382 U.S. 858, 86 S.Ct. 114, 15 L.Ed.2d 96 (1965); *Democratic State*

*Comm. v. Andolsek,* 249 F.Supp. 1009 (D.Md.1966)."

This Court finds itself constrained by the same considerations noted by the Second Circuit Court of Appeals in *Kletschka, supra.* The Court cannot sit as a Super Civil Service Commission in reviewing the substantive merits of government personnel decisions. The Supreme Court recently reaffirmed this position in *Bishop v. Wood,* —— U.S. ——, ——, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976):

"The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies [footnote omitted]. We must accept the harsh fact that numerous mistakes are inevitable in the day-to-day administration of our affairs. The United States States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause . . . is not a guarantee against incorrect or ill-advised personnel decisions."

In the instant case, it is plain that Doctor Gilbert did not get along with his associates in large part due to his personality. This problem prevented his satisfactory administration of the V.A.'s research program. For that reason, the V.A.H., Atlanta, sought to transfer Doctor Gilbert elsewhere. Such action cannot be arbitrary and capricious. To hold otherwise would hamstring the V.A. in its ability to place employees where they are most effective to the V.A. The Court rejects Doctor Gilbert's claim that he has a right to remain at his former position of Associate Chief of Staff at the Atlanta V.A. Hospital, no matter what effect this may have on the proper administration of the V.A. Hospital and its programs. The District Court in *Motto v. General Services Administration of United States,* 335 F.Supp. 694, 697 (E.D.La.1971), also rejected this position when the Court stated:

"There is no reason why GSA, or any government agency, should be required to provide lifelong employment on his own terms to an employee who does not do a satisfactory. job, either because of his work results or his personality. But neither should any supervisor be permitted to make his own subjective determination that an employee is undesirable, and set out to achieve that person's separation from service by a calculated series of actions designed to force his resignation."

Despite Doctor Gilbert's allegations that he, too, was victimized "by a calculated series of actions designed to force his resignation," the Court finds that the actions of the Veterans Administration officials were taken in good faith (see same finding in the Court's June 16, 1972 Order), that a substantial and rational evidentiary basis exists for the V.A.'s decision in this case and that Doctor Gilbert was afforded all the procedural due process protections to which he was entitled.

Accordingly, the Court finds no error below in this review of the Veterans Administration's actions.

By so ruling, it now appears to the Court that there remain no further issues to be decided by this Court. Therefore, the court will consider this Order to be a final judgment in favor of the defendants, unless the parties inform the Court within ten (10) days as to what further proceedings may be required in this matter.

SO ORDERED.

### SUPPLEMENTAL OPINION

In the Court's Order entered July 1, 1976, in the above matter, granting judgment in favor of the defendants, the parties were given ten (10) days during which to inform the Court as to what further proceedings may be required in this matter.

Plaintiff has indicated three matters which he alleges merit further consideration by the Court: (1) the amount of back

pay owed plaintiff; (2) the impropriety of the defendant's decision to transfer plaintiff to another Veteran's Administration Hospital (VAH); and (3) a determination of plaintiff's present status at the VAH. Furthermore, the case is presently before the Court on Sam F. Lowe, Jr.'s motion for a protective order as to attorney's fees and expenses, and to be relieved as counsel for plaintiff.

### Back Pay

In the Order entered June 16, 1972, the Court stated as follows:

"Because a hearing was required and not held, plaintiff is entitled to back pay and the matter will be remanded to the Veterans Administration for the purpose of giving the hearing required by the statute, but the plaintiff will be entitled to receive compensation until the effective date of the decision of the Board convened under the statute.

. . . . .

"That the plaintiff be and he is hereby reinstated with the Veterans Administration with the right to receive, until the effective date of a decision by a Board convened by the Veterans Administration in accordance with this Order, all the salary and other rights and privileges pertaining to the classification and status he held prior to separation, . . ."

It appears to the Court that plaintiff was paid his salary through December 1972, and has received no further remuneration from the Veterans Administration since that time. The Disciplinary Board issued its decision on July 17, 1974. Subsequently, on August 17, 1974, plaintiff appealed the implementation of that decision, i.e., to transfer plaintiff to another VAH, to the Administrator. The Administrator, on March 17, 1975, sustained the Board's decision and the resulting implementation of that decision.

The defendant is hereby ORDERED to pay plaintiff the remuneration to which he is entitled from January 1, 1973, through March 17, 1975, which is the effective date of the Board's decision, in accordance with the terms of the Court's order of June 16, 1972, and with interest according to law. Doctor Gilbert is not entitled, however, to remuneration for those time periods during which he took a leave of absence.

### Plaintiff's Transfer

Plaintiff contends that the decision to transfer him is inconsistent with the Board's decision recommending only "minimal disciplinary action." Moreover, plaintiff alleges that the type of transfer envisaged contemplates punishment of the severest type conceivable for a professional, exceeding that recommended by the Board.

In the Court's Order of July 1, 1976, the Court indicated that the decision to transfer plaintiff was in accordance with the terms of the Board's decision and the prevailing authority on this subject. Accordingly, the plaintiff's objections in this regard are hereby ORDERED OVERRULED.

### Plaintiff's Present Status

Plaintiff requests the Court to clarify his status at the VAH by ordering the VAH to assign plaintiff a position that is consistent with the Board's recommendation and consistent with the holding in *Kletschka v. Driver*, 411 F.2d 436, 444–45 (2nd Cir. 1969):

"While under § 4110(d) the Administrator is free to reject a recommendation for disciplinary action, he is not, as we read the statute, free to impose disciplinary action which the board has not recommended."

Presumably the VAH will act consistently with the Board's decision and the law. The question of Doctor Gilbert's present status at the VAH is not properly before the Court at this time, but rather, it would be more appropriately raised as a separate civil action.

### Motion for a Protective Order

Sam Lowe, Jr., Doctor Gilbert's former counsel, requests that the Court issue a protective order relating to an asserted claim for attorney's fees in the sum of $47,117.40. Mr. Lowe has presented the

Court with no authority for such relief other than a similar application made to the Court by Mr. Lowe's predecessor as attorney for Doctor Gilbert. The question of attorney's fees at that earlier time was settled by the parties and a consent order was entered. See Order entered December 14, 1973. Mr. Lowe has entered into no such consent agreement with the plaintiff. Sam Lowe, Jr.'s motion for a protective order as to fees and expenses is hereby ORDERED DENIED. Sam Lowe, Jr.'s motion to be relieved as counsel for plaintiff is ORDERED GRANTED.