**Paul COURTS, Plaintiff,**

v.

**ECONOMIC OPPORTUNITY AUTHORITY FOR SAVANNAH–CHATHAM COUNTY AREA, INC., Defendant.**

**No. CV477–173.**

United States District Court,
S. D. Georgia,
Savannah Division.

May 17, 1978.

Edward R. Downs, Jr. and Charles W. Bell, Savannah, Ga., for plaintiff.

Aaron L. Buchsbaum, Savannah, Ga., for defendant.

## OPINION

LAWRENCE, District Judge.

### I

The plaintiff, Paul Courts, was discharged as Project Director of the Veterans' Outreach Center on June 9, 1977. The complaint alleges that he was wrongfully discharged for exercising his First Amendment rights and was denied procedural due process. He seeks reinstatement through mandatory injunctive relief and also compensatory damages.

This Court denied cross-motions of the parties for summary judgment in an Order dated March 15, 1978. In it, I noted that there were two crucial questions: (1) whether Mr. Courts' comments on a radio program recommending innovativeness in qualifying for the Comprehensive Employment and Training Act Programs (CETA) were constitutionally protected and (2) whether his comments constituted "gross insubordination" such as would justify the defendant in waiving the procedural guidelines in the case of terminations.

A jury trial was waived. The case was tried before the Court on April 6, 1978. Only Mr. Courts and John H. Finney, Executive Director of EOA, testified in person. The depositions or affidavits of those two witnesses as well as others were stipulated as part of the record in the case.

The Veterans' Outreach Center is an agency created to help veterans readjust to civilian life. It counsels and assists veterans in finding jobs. Originally, VOC was an independent agency associated with Savannah State College. In November, 1974, the Center was placed under the supervision and control of the Economic Opportunity Authority which is a state-chartered local community action agency formed pursuant to 42 U.S.C. § 2790 *et seq.* It is primarily funded from various federal grants by the Community Services Administration, a federal agency.

### II

Mr. Courts served as Project Director of the Veterans' Outreach Center from August 1, 1973, until his termination in June, 1977. On June 9, 1977, Mr. Finney, the Executive Director of EOA, wrote to Courts detailing several areas of dissatisfaction with his performance as Project Director. The letter concluded, "even though you have repeatedly received opportunities to improve your performance with no past direct disciplinary action other than memorandums and reprimands, I find it necessary to present you with notice of termination for cause. . . ."

The various incidents referred to in the letter were dealt with at the hearing in this Court. The overriding consideration, according to Mr. Finney and as the evidence shows, was a radio program appearance by Courts on June 2, 1977. The program is a local audience participation show in which listeners call in with questions. Courts and George Chiotellis, Labor Resources Director for the City of Savannah, were also guests on the program. It appears that someone called in and stated that her son was not able to qualify for the CETA program. According to Courts, he informed her that her son should be "innovative."[1] He added

---

1. Mr. Courts' exhortation that prospective beneficiaries be innovative is nothing new in bureaucratic circles. Dallin H. Oaks, President of Brigham Young University, thus comments on the subject in his paper "Unruly Laws for Lawmakers":

 "A distinguished British scholar showed this principle in operation in the behavior of what she called 'civil servants and academics and all kinds of social experts whose livelihood and advancement depend upon a continuing supply of social problems and deprived citizens.' Her study showed these social planners perplexed at the substantial number of deprived individuals who appeared to be unaware of their deprivation and unwilling to claim the social welfare benefits to which they were entitled under British law. As a result, the government did what any businessman does when sales are flagging. It mounted an expensive advertising campaign begging people to use their welfare benefits.

that he had heard of someone using a license tag as an address in order to qualify. Courts explained at the trial that he did not intend to suggest that anyone use improper or unlawful methods to qualify. He testified that he merely intended to convey the idea that CETA personnel were aware of the different means of cheating and that, therefore, people would get caught if they gave false information.

Mr. Chiotellis was generally in agreement with Courts' version. However, he disagreed with plaintiff's interpretation of the effect of his comments. He deposed that the "obvious inference and intent of those remarks by Mr. Courts appeared to be a direct invitation to listeners to give false information in order to receive consideration for CETA jobs."

Frank P. Wise, Assistant City Manager of Savannah, had listened to the program. He deposed that "the tenor of [the] remarks was advocating that persons seek ways to circumvent the intent, spirit and regulations of the CETA program to make themselves eligible when in fact they are not."

Mr. Finney did not hear the radio program. He testified that one or two EOA employees told him that they thought Mr. Courts' comments had been detrimental to the agency. He contacted Messrs. Chiotellis and Wise and they confirmed this report. (See Ex. F and Ex. G of Defendant's motion for summary judgment). Finney concluded that the detrimental effect of the comments, in addition to other problems of the agency with the Project Director, necessitated his immediate discharge.

The other four incidents are of a comparatively minor nature. For the most part, they reflect inadequate communications between Mr. Courts and his supervisor and between him and his subordinates.

The first incident involved the work-release program. Under it, students working for VOC were entitled to a certain number of hours off from work each week to attend classes. Some of the employees were taking off more than the allotted time. Some apparently did not have the proper authorization. When Courts discovered this situation, he says that he took corrective action. According to Mr. Finney, the corrective action came too late.

The second incident concerned inappropriate contract negotiations. Mr. Courts explained that he received EOA forms on which he was to specify the number of summer youths he could employ. (The summer program is a CETA program designed to find jobs for high school students). The forms were to be filled out and returned to EOA which would then consolidate the information from all of its agencies and submit one request to the Savannah Manpower Office. The completed EOA form was sent, by mistake, directly from VOC to the Manpower Office. Mr. Finney testified that this action created confusion in the Manpower Office and was strictly against EOA directives.

The other incidents involve unauthorized press releases. One story appeared in *Reveille*, the national monthly for veterans, in which it was said:

"Johnny Davis who used to do the upgrading, has moved on to another job with Southern Bell. Paul [Courts] tells us he's in a management training program at $11,000 a year. 'We couldn't offer him that kind of money here,' says Paul."

(Ex. E attached to affidavit of Sandra Collins, Defendant's Motion for Summary Judgment).

"When I first read that description I thought it farfetched. Imagine, government workers trying to multiply welfare expenditures! I accepted its accuracy a few months ago when I was exposed to an intensive advertising campaign on commercial radio stations in Salt Lake City urging qualified persons to use federal food stamps and lamenting the fact that this valuable benefit was being used by fewer people than the govern- ment planners had estimated. The effort to promote welfarism is surely a successful one. In the decade from 1965 to 1975 the number of participants in the food stamp program increased from 1 in 439 to 1 in 13, and public expenditures have soared from $36 million to $5.2 billion, 150 times their level 10 years earlier." See the address delivered at the Judicial Conference, Fifth Circuit, April 24, 1978.

Courts denied having spoken with anyone from *Reveille.* The VOC employee in charge of public relations handled the interview. Plaintiff testified that he had tried to kill the story prior to its appearance. Mr. Finney said that it was against EOA policy to discuss salaries in public.

The other story appeared in *The Herald,* a Savannah newspaper. Written by a VOC staff member, it told of a successful "get out to vote" campaign in which VOC members carried voters to the polls. (Ex. D attached to affidavit of Sandra Collins, Defendant's Motion for Summary Judgment). Courts testified that the VOC personnel who participated were on their own time and were not acting in any official capacity. Mr. Finney was concerned about the story because political activity of any kind is prohibited by federal law. Funds for the EOA could have been summarily discontinued because of such activity.

Courts testified that he never received an official reprimand concerning any of these incidents. He admits that he spoke to the Executive Director of EOA about them and, in one or two instances, had received memoranda from him. Defendant argues that their conferences and memoranda are tantamount to official reprimands.

Plaintiff was terminated on June 9, 1977. A hearing before the Grievance and Appeals Committee was held on June 21st. Mr. Courts had prior notice of the meeting and of the charges and was represented by counsel at the hearing. He testified in person and his attorney cross-examined the witnesses. On June 23rd, the Committee affirmed the termination. The Executive Committee of EOA approved that action on June 24th.

### III

What is the standard of judicial review in this case? What weight is to be accorded findings of fact by the Grievance and Appeals Committee of the EOA which is a private corporation? Is a *de novo* hearing required in this Court? The fog over Chancery Lane in London was no thicker in Dickens' day than the mists presently enshrouding this area of American law.

 Employees of community action organizations are employees of a private corporation and not of the federal government. *Robles v. El Paso Community Action Agency, Project Bravo, Inc.,* 456 F.2d 189 (5th Cir.); *Hines v. Cenla Community Action Committee, Inc.,* 474 F.2d 1052 (5th Cir.). The "scope of review" provision of the Administration Procedure Act (5 U.S.C. § 706) which requires the setting aside of arbitrary or capricious agency action is inapplicable here. Since racial discrimination is not involved, the discharged employee has no right to a *de novo* hearing in a federal court. See *Chandler v. Roudebush, Administrator of Veterans Affairs,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416.

In a recent decision of the District of Columbia Circuit where the discharge of a federal civil service employee was challenged, Judge Tamm said:

"[I]t is at least reasonably well-settled that, whatever its exact scope, judicial review in the federal courts is necessarily limited. Federal judges do not sit as ombudsmen for government employment relations, nor do we indulge the conceit of substituting our own judgment *ad libitum* for that of the agency. Rather, we concern ourselves in the personnel business only insofar as is necessary, to assure that the action challenged (1) is not arbitrary or capricious; (2) was reached in conformity with relevant procedural requirements; and (3) was not otherwise unconstitutional." See *Doe v. Hampton,* 566 F.2d 265, 271–72.

In the Fifth Circuit judicial review of agency decisions involving federal employees has been said to be limited to a determination (a) of whether there has been procedural due process and (b) whether the decision is arbitrary or capricious. *Davis v. Vandiver,* 5 Cir., 494 F.2d 830; *Chiriaco v. United States,* 5 Cir., 339 F.2d 588; *Dozier v. United States,* 5 Cir., 473 F.2d 866; *Smith v. United States Air Force et al.,* 5

Cir., 566 F.2d 957; *Gilbert v. Johnson*, 419 F.Supp. 859, 869 (N.D., Ga.).[2]

The Court of Appeals of this Circuit has held that administrative findings are entitled to great weight when supported by "substantial evidence." *Ferguson v. Thomas*, 5 Cir., 430 F.2d 852. It is stated in *Carastro v. Gainer*, 434 F. Supp. 296, 299 (S.D., Fla.) that "The District Court is not expected to conduct a de. novo hearing. Rather, the initial inquiry is whether or not federal rights have been violated in the procedures of the Board based upon an examination of the record. If not, the Court must then view the record to determine whether substantial evidence supports the action of the Board."

It must be kept in mind that "It is not the Court's function to review the wisdom or good judgment of these state officials in the exercise of their discretion in matters of employee transfer or removal." *London v. Florida Department of Health and Rehabilitative Services*, 313 F.Supp. 591, 596 (N.D., Fla.), aff'd 448 F.2d 655 (5th Cir.), cert. denied 406 U.S. 929, 92 S.Ct. 1765, 32 L.Ed.2d 131. "The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684.

█ I conceive the standard of review in the adverse personnel action taken by EOA in this case to be as follows. After determining whether procedural due process was accorded Mr. Courts, the record must be scrutinized to ascertain whether the agency's action was arbitrary or capricious. Ordinarily this will involve examination of the grounds on which the dismissal was based and a determination of whether they are supported by substantial evidence. These findings are to be made without any Jovian concept of the judicial role, for the Court's

judgment is not to be lightly substituted for the agency's.

Finally, this Court must decide independently and *de novo* whether the discharge of plaintiff was primarily motivated by his exercise of a constitutionally protected right of free speech, a question not raised or dealt with on the administrative level.

### IV

Mr. Courts was notified of his imminent termination which became effective before the hearing on the various charges of unsatisfactory performance. As noted earlier, the letter of the Executive Director listing the complaints and terminating his employment for cause was dated June 9, 1977. The hearing before the Grievance and Appeals Committee took place two weeks later.

The procedures for reprimanding and terminating employees are contained in the guidelines of Economic Opportunity for Savannah-Chatham County, Inc. They provide for a verbal reprimand on the first occasion of fault; a written reprimand on the second and a warning notice on the third occasion at which time the employee may be probated or even terminated if the offense is serious enough.

█ Plaintiff complains that the three-step process was not followed in his case. It is a denial of due process for any government agency to fail to follow its own regulations pertaining to adjudication processes. *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; *Government of the Canal Zone v. Brooks*, 427 F.2d 346 (5th Cir.).

Defendant contends that there was substantial compliance with the required procedures in that there were conversations with Courts concerning the complaints and writ-

---

2. In Georgia the statutory standard of judicial review of decisions by the State Personnel Board appears to be the "any evidence" rule. See *Hall v. Ault*, 240 Ga. 585, 242 S.E.2d 101 construing the standards established in Ga. Code Ann. § 40–2207.1(m) which state that "The court shall not substitute its judgment for that of the board as to the weight of the evi-

dence on questions of fact." The decision in *Hall* affirmed the ruling in 143 Ga.App. 158, 237 S.E.2d 653. The Georgia Administrative Procedure Act adopts a similar standard. Ga. Code Ann. § 3A–120(h). See Hinchey, "Administrative Law," 29 *Mercer Law Review* (Fall, 1977), 12 ff.

ten memoranda filed as to the problems of improper contract negotiations, unauthorized press releases and political activity. It is not necessary to determine whether this was a compliance with the guidelines in the light of an exception therein to the general rule. The three-step procedure may be waived if the offense is an extremely serious one such as "gross insubordination." In such a case the employee may be "terminated immediately."

The evidence before the Grievance and Appeals Committee was sufficient to support its implicit finding that the Executive Director was authorized, under the circumstances, to terminate the Project Director immediately. Procedural due process is not lacking where a full, fair and prompt hearing on the charges was afforded the employee.

V. Mr. Courts has the burden of proving that his speech was constitutionally protected and that its exercise was a substantial factor in his discharge. See *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471. Mr. Finney admitted on the stand that plaintiff's radio comments were a factor. However, that was not the only area of unsatisfactory performance by plaintiff of his duties.

In determining whether a public employee's speech is constitutionally protected, the problem "is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811.

An employer is entitled to the loyalty of his employees. 53 Am.Jur.2d, Master and Servant § 97. "[A] government employee may be required to forfeit his right to publicly and truthfully criticize his superiors if he occupies a high ranking position which requires continued loyalty to them and if such criticism *actually* undermines their working relationship . . ." *Muir v. County Council of Sussex County*, 393 F.Supp. 915, 933 (D.Del.). A public employee does not have the right to engage in conduct that is unprofessional and inconsistent with the proper performance of his duties. *Phillips v. Adult Probation Department of the City and County of San Francisco*, 491 F.2d 951 (9th Cir.).

In *Doe v. Hampton, supra*, Judge Tamm suggests that "The nature of the particular job as much as the conduct allegedly justifying the action has a bearing on whether the necessary relationship obtains [*i. e.*, the relationship between the ground of complaint and the promotion of the efficiency of the service]. The question thus becomes whether the asserted grounds for the adverse action, if found supported by evidence, would directly relate either to the employee's ability to perform approved tasks or to the agency's ability to fulfill its assigned mission." 566 F.2d at 272, n.20.

The conclusion reached by the Grievance and Appeals Committee that plaintiff's radio comments amounted to an invitation to persons to abuse the CETA program is supported by substantial evidence. Plaintiff has therefore failed to carry his burden of proving that his comments were constitutionally protected speech.

## ORDER

Finding that (a) procedural due process was not denied plaintiff; (b) that his dismissal was neither arbitrary nor capricious; (c) that there were substantial evidence before the Committee in support of the principal charges on which Mr. Courts' termination as Project Director was based, and (d) that the radio remarks attributed to plaintiff did not amount to protected speech under the First Amendment, judgment will accordingly be entered in favor of the defendant.